**RAINES FELDMAN LITTRELL LLP**
Kyra E. Andrassy (State Bar No. 207959)
*kandrassy@raineslaw.com*
Robert S. Marticello (State Bar No. 244256)
*rmarticello@raineslaw.com*
Stephen M. Mott (State Bar No. 362642)
*smott@raineslaw.com*
4675 MacArthur Court, Suite 1550
Newport Beach, CA 92660
Telephone: (310) 440-4100
Facsimile: (310) 691-1943

[Proposed] Counsel for Debtor
Chino Central Group, LLC

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT – SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>CHINO CENTRAL GROUP, LLC,<br><br>Debtor in Possessio. | Case No.: 8:26-bk-10925-SC<br><br>Chapter: 11<br><br>**MOTION PURSUANT TO 11 U.S.C. § 364(b) TO ENTER INTO PREMIUM FINANCE AGREEMENT WITH FIRST INSURANCE FUNDING, A DIVISION OF LAKE FOREST BANK & TRUST COMPANY, N.A.; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF HOWARD GROBSTEIN IN SUPPORT THEREOF**<br><br>[Filed concurrently with an Application for Order Shortening Time for Notice]<br><br><u>Hearing Information</u>:<br>DATE: TBD<br>TIME: TBD<br>CTRM: 5C |

**TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:**

Chino Central Group, LLC, the debtor and debtor-in-possession (the "**Debtor**"), hereby seeks Court approval under 11 U.S.C. § 364(c)(2) to enter into a premium financing agreement with FIRST Insurance Funding, a Division of Lake Forest Bank & Trust Company,

N.A., to finance the premiums for new property insurance for the real property owned by the Debtor and for liability insurance to protect the Debtor from claims. In support of the Motion, the Debtor submits the following memorandum of points and authorities and the declaration of Howard Grobstein in support thereof, and respectfully represents as follows:

## I. BASIS FOR EXPEDITED RELIEF

The Debtor is under new management and is concerned that the current policy is one that was placed by the Debtor's former asset manager, Continuum Analytics, and that if Continuum defaults on any portion of its share of the payments, it puts the Debtor's insurance coverage into jeopardy. Accordingly, the Debtor is seeking to place its own insurance effective on or about July 10, 2026. The Debtor does not have sufficient funds on hand to pay the entire premium payments so must finance the premiums. The Motion was not filed sooner because the terms were recently finalized and the premium financing company requested to approve the form of the Motion prior to its filing, and that approval was only recently obtained. The Debtor is informed that neither Western Alliance Bank nor DS PE Holdco II, LLC, oppose the relief sought in the Motion.

## II. BACKGROUND

On March 24, 2026 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned case. The Debtor is operating as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this case and no official committees have been appointed or designated. This case constitutes a single asset real estate case. Postpetition, Howard Grobstein was appointed as the manager of the Debtor.

The Debtor is a co-owner of the Chino Towne Center, a shopping center located at 12125 Central Avenue, Chino, CA 91710 (the "**Property**"). The Property was appraised as having an as-is value of approximately $29 million as of February 2025. It is encumbered by

liens in favor of Western Alliance Bank and Nano Banc in the total estimated amount of approximately $19.1 million. There is a third lien of record in favor of Cantor Group V, LLC, that is disputed and which was pledged as collateral by Cantor Group V, LLC to Western Alliance Bank in connection with a different loan.

The Property is currently insured under a group policy believed to have been obtained by Continuum Analytics, which is an asset manager for a number of different special purpose entities, including a number that have chapter 11 bankruptcy cases pending in the Central District of California and an unknown number of entities that have not sought bankruptcy protection. The Debtor understands that because of the way that the financing for the insurance policies was structured, a default by one entity in payment of its share of the premium may jeopardize the coverage for the other entities. Because the Debtor does not have control over that and given the importance of having sufficient insurance coverage, the Debtor, under Mr. Grobstein's supervision, has obtained quotes for standalone insurance policies. Subject to approval of this Motion, (1) Maxum Indemnity Company is prepared to issue a liability insurance policy with a general aggregate limit of $2 million and a per occurrence limit of $1 million, a copy of which is attached as **Exhibit 1**, (2) Amalgamated Insurance Underwriters, which is related to Lloyds of London, is prepared to issue a property insurance policy covering all real and personal property, and a copy of the proposal is attached as **Exhibit 2**, and (3) StarStone National Insurance Company and Scottsdale Insurance Company will issue umbrella coverage (together, these are referred to as the "**Policies**"). The cumulative annual premiums for the Policies, with fees and taxes, total $134,163.82. The Debtor has $144,679.80 in cash on hand as of July 1, 2026.

FIRST, which is a division of a national bank engaged in the business of financing insurance premiums, is willing to finance the $134,163.82 in premiums, taxes, and fees for the Policies, subject to Court approval, with a down payment of $36,791.31 and nine payments of $11,460.04 due on the first of each month, starting on or about July 10, 2026.[1] The annual

---

[1] The Premium Finance Agreement provides that for the payment to be made July 1, 2026, but will be updated to reflect the later start date.

percentage rate is 14.0%. To secure the repayment of this amount, any late charges, attorney's fees and expenses, and other costs under the financing agreement (collectively, the "**Indebtedness**"), the Debtor will grant and assign to FIRST a first priority lien on, and security interest in, the Policies, including all returned premiums and unearned premiums and all other collateral defined in the Finance Agreement (collectively, the "**Finance Agreement Collateral**"). A copy of the Finance Agreement is attached as **Exhibit 3**. Pursuant to the Finance Agreement, in the event of a default, the Debtor irrevocably appoint FIRST as the Debtor's attorney-in-fact with full power of substitution and authority, to: (a) cancel the Policies; (b) receive all sums assigned to it, including the Finance Agreement Collateral; and (c) execute and deliver, on the Debtor's behalf, all documents relating to the Policies in furtherance of the Finance Agreement.

In order to reduce the cash the estate must fund at binding, Trustee Insurance Services is willing to advance a portion of the required down payment on the Debtor's behalf, with that advance to be repaid over five months. This means that upon Court approval of this Motion, the Debtor will need to pay FIRST $20,124.57, with nine monthly payments to FIRST of $11,571.85 starting on or about July 10, 2026. Trustee Insurance Services will fund the balance of the deposit, which is $16,666.74, at 15% interest to be repaid over five months, which equates to $3,459.38 per month. There is no additional contract with Trustee Insurance Services other than as set forth in this Motion.

The Policies are essential to the preservation of the Debtor's assets and business and required by its secured creditors and the Office of the United States Trustee. The form of the proposed order required by FIRST is attached as **Exhibit 4**.

## III. LEGAL ARGUMENT

Under section 1108 of the Bankruptcy Code, the Debtor is authorized to operate its business. Section 363(c )(1) authorizes a debtor-in-possession to enter into ordinary course transactions and to use property of the estate in the ordinary course of business. The Debtor

intends to enter into the Finance Agreement in the ordinary course of its affairs and believes that honoring its obligations under the Finance Agreement is in the best interests of the estate.

Section 364 of the Bankruptcy Code authorizes the Debtor to obtain postpetition financing in the manner proposed in the Finance Agreement. Specifically, Section 364(c) provides, in pertinent part, that if the debtor is unable to obtain credit solely on an unsecured basis, the court "may authorize the obtaining of credit or the incurring of debt – (2) secured by a lien on property of the estate that is not otherwise subject to a lien." 11 U.S.C. § 364(c)(2). By extending secured credit under the Finance Agreement, FIRST is enabling the Debtor to obtain coverage under the Policies, subject to FIRST's first-priority lien and security interest. Additionally, FIRST is extending financing under the Finance Agreement in good faith and is entitled to the protections of Section 364(e).

The Debtor and FIRST have reached an agreement that the adequate protection appropriate for this financing, subject to the approval of the Court, is as follows:

a. The Debtor is authorized and directed to timely make all payments due under the Finance Agreement and FIRST is authorized to receive and apply such payments to the Indebtedness pursuant to the Finance Agreement.

b. If the Debtor does not make any of the payments under the Finance Agreement as and when due, the stay of Section 362(a) (to the extent otherwise applicable) shall automatically lift (without further order of the Court) to enable FIRST and/or third parties, including insurance companies providing the coverage under the Financed Policies, to take all steps necessary and appropriate to cancel the Financed Policies, recover and collect the Finance Agreement Collateral, and apply the Finance Agreement Collateral to the Indebtedness. In exercising such rights, FIRST and/or third parties shall comply with the notice and other relevant provisions of the Finance Agreement.

c. If any Indebtedness remains unpaid after application of the Finance Agreement Collateral, following an event of a default or otherwise, such unpaid amount shall be treated as an administrative expense claim pursuant to Section 503(b)(1) in the Debtor's bankruptcy estate.

d. If there are excess returned premiums, unearned premiums, or other Finance Agreement Collateral after application of the Finance Agreement Collateral to the Indebtedness, following and event of default or otherwise, the excess shall be turned over to the Debtor or any subsequently appointed trustee (under Chapter 7 or 11).

It is common practice for insurance premium finance lenders such as FIRST to require that the Debtor grant a security interest in the insurance policies financed in exchange for financing. Absent a first-priority lien on and security interest in the Finance Agreement Collateral, FIRST would not enter into the Finance Agreement. Further, the Debtor believes that it would be unable to secure such financing on an unsecured basis from another lender on economic terms comparable to those under the Finance Agreement. The Debtor would be unable to take out the Financed Policies and obtain coverage in the absence of the Finance Agreement, and the Finance Agreement Collateral would not exist but for the Finance Agreement. The Debtor has obtained written consent from Western Alliance Bank and DS PE Holdco II, LLC, to the use of their cash collateral to pay these premiums,

The Debtor has determined in its business judgment that the Finance Agreement is the Debtor's best option and provides the most favorable terms. The Debtor believes the Finance Agreement and its terms are commercially fair and reasonable. The Debtor is required to maintain adequate insurance coverage and, without it, would be unable to operate. Moreover, approval of the Finance Agreement will ensure that the Debtor can continue to operate and will not prejudice the legitimate interests of creditors and other parties in interest.

Accordingly, the Debtor believes that the Motion may be granted.

## IV. <u>CONCLUSION</u>

WHEREFORE, the Debtor requests that the Court enter an order in the form attached as Exhibit 4 and grant such other and further relief as the Court may deem just and appropriate

Dated: July 1, 2026

**RAINES FELDMAN LITTRELL LLP**

By: */s/ Kyra E. Andrassy*
Kyra E. Andrassy
Proposed Counsel for Chino Central Group, LLC

**DECLARATION OF HOWARD GROBSTEIN**

I, Howard Grobstein, declare as follows:

1. Effective April 16, 2026, I am the Manager for Chino Central Group, LLC, the debtor and debtor-in-possession in the above captioned case. I know each of the following facts to be true of my own personal knowledge, except as otherwise stated and, if called as a witness, I could and would competently testify with respect thereto. I make this declaration in support of the *Motion Pursuant to 11 U.S.C. § 364(b) to Enter Into Premium Finance Agreement with FIRST Insurance Funding, a Division of Lake Forest Bank & Trust Company, N.A.* (the "**Motion**"). Unless otherwise defined in this declaration, all terms defined in the Motion are incorporated herein by this reference.

2. The Debtor is a co-owner of the Chino Towne Center, a shopping center located at 12125 Central Avenue, Chino, CA 91710 (the "Property"). The Property was appraised as having an as-is value of approximately $29 million as of February 2025. It is encumbered by liens in favor of Western Alliance Bank and Nano Banc in the total estimated amount of approximately $19.1 million. There is a third lien of record in favor of Cantor Group V, LLC, that is disputed and which I am informed was pledged as collateral by Cantor Group V, LLC to Western Alliance Bank in connection with a different loan.

3. The Debtor filed its case because Nano Banc had scheduled a foreclosure sale for April 1, 2026, and because of pending litigation. The co-owner of the Property is an affiliated entity, Vineyard Village Group, LLC. It has not filed a chapter 11 petition because it has not yet obtained the corporate authority to do so. The Debtor owns an undivided 65.91% interest and Vineyard Village owns an undivided 34.09% interest, as tenants in common. I was appointed as the Debtor's manager postpetition and intend to sell the Property.

4. The Property is currently insured under a group policy believed to have been obtained by Continuum Analytics, which I understand to be an asset manager for a number of different special purpose entities, including a number that have chapter 11 bankruptcy cases pending in the Central District of California and an unknown number of entities that have not

sought bankruptcy protection. Based on a phone conversation with the Debtor's current insurance agent, because of the way that the financing for the insurance policies was structured, a default by one entity in payment of its share of the premium may jeopardize the coverage for the other entities. Because the Debtor does not have control over that and given the importance of having sufficient insurance coverage, I obtained quotes for a standalone insurance policy. A true and correct copy of the proposal from Maxum Indemnity Company for a liability policy is attached as **Exhibit 1**. A true and correct copy of the proposal from Amalgamated Insurance Underwriters, which I understand is related to Lloyds of London, for a property insurance policy is attached as **Exhibit 2**. I am informed that StarStone National Insurance Company and Scottsdale Insurance Company will issue umbrella coverage (together, the liability, property and umbrella policies are referred to as the "Policies"). The cumulative annual premiums for the Policies, with fees and taxes, total $134,163.82.

5. FIRST, which I am informed is a division of a national bank engaged in the business of financing insurance premiums, is willing to finance the $134,163.82 in premiums, taxes, and fees for the Policies, subject to Court approval. A true and correct copy of the Finance Agreement is attached as **Exhibit 3**. The form of the order required by FIRST is attached as **Exhibit 4**. I understand that the Finance Agreement payment dates will be updated to reflect the actual commencement date of the new Policies.

6. In order to reduce the cash the estate must fund at binding, Trustee Insurance Services, who was the broker I used and have used before in a number of other cases, is willing to advance a portion of the required down payment on the Debtor's behalf, with that advance to be repaid over five months. This means that upon Court approval of this Motion, the Debtor will need to pay FIRST $20,124.57, with nine monthly payments to FIRST of $11,460.04 starting on or about July 1, 2026. Trustee Insurance Services will fund the balance of the deposit, which is $16,666.74, at 15% interest to be repaid over five months, which equates to $3,459.38 per month. There is no additional contract with Trustee Insurance Services other than as set forth in this Motion. As of July 1, 2026, the Debtor has $144,679.80 in cash on hand. Because of delays in getting financial information from former

management, I am just now preparing 13-week cash flow projections that I believe are accurate and which I will submit to the secured creditors for review. I intend to seek Court approval of either a stipulation for the use of cash collateral or a motion for the use of cash collateral. Until then, I have been seeking consent on an expense by expense basis. I do not believe that utilizing the cash on hand to pay for the annual premium in one lump sum would be prudent and would likely cause the Debtor to need to seek debtor-in-possession financing to cover its other expenses pending a sale of the Property.

7. The Policies are essential to the preservation of the Debtor's assets and business and required by its secured creditors and the Office of the United States Trustee. Based on my experience as a fiduciary and because Trustee Insurance Services solicited insurance proposals and financing proposals on my behalf and the one presented to the Court is the best, I believe that the Finance Agreement offers the best terms available and that the Debtor would be unable to secure such financing on an unsecured basis from another lender on economic terms comparable to those under the Finance Agreement. The Debtor would be unable to take out the Financed Policies and obtain coverage in the absence of the Finance Agreement because of the cash on hand, and the Finance Agreement Collateral would not exist but for the Finance Agreement.

8. The Debtor is requesting that the hearing on the Motion be set on shortened time because the Policies are set to be bound on or about July 10, 2026. I am concerned that the current property and liability policies were placed by the Debtors' former asset manager, Continuum Analytics, and that if Continuum defaults on any portion of its share of the payments, it puts the Debtor's insurance coverage into jeopardy. The Debtor does not have sufficient funds on hand to pay the entire premium payments so must finance the premiums. The Motion was filed promptly after the final figures were received from the insurance broker and after the legal team at the premium finance company, which requested to approve the Motion before it was filed, approved the form of the Motion.

I declare under penalty of perjury under the laws of the United States of America that

the foregoing is true and correct.

Executed on this 1st day of July, 2026 at Woodland Hills, California.

Howard Grobstein

# EXHIBIT 1

RYAN® TURNER SPECIALTY

RT Specialty
540 West Madison St
9th Floor
Chicago, IL 60661
Tom Mullins
312-878-8318

# Insurance Proposal

**May 18, 2026**

**Trustee Insurance Agency**
Attn: Jessica Cox
PO Box 190 Vicksburg, MI 49097

**Applicant:** Chino Central Group LLC
520 Newport Center Dr Ste 480
Newport Beach, CA 92660

**Submission #:** APP114611274
**Policy Period:** 06/01/2026 12:01 AM To 06/01/2027 12:01 AM
**Coverage:** Liability
**Issuing Company:** Maxum Indemnity Company

---

**CALIFORNIA SHORT RATE CANCELLATION PENALTY DISCLOSURE**

Please be advised that if you request cancellation of your policy prior to the expiration, the policy may be cancelled at a rate less than pro rata.

Please refer to your policy for specific terms and conditions.

RT Specialty
540 West Madison St
9th Floor
Chicago, IL 60661
Tom Mullins
312-878-8318

# Insurance Proposal

**May 18, 2026**

**Trustee Insurance Agency**
Attn: Jessica Cox
PO Box 190 Vicksburg, MI 49097

**Applicant:** Chino Central Group LLC
520 Newport Center Dr Ste 480
Newport Beach, CA 92660

**Submission #:** APP114611274
**Policy Period:** 06/01/2026 12:01 AM To 06/01/2027 12:01 AM
**Coverage:** Liability
**Issuing Company:** Maxum Indemnity Company

---

We are pleased to submit our proposal for the above captioned applicant.

Please read the attached quote carefully as coverage offered may be more limited than coverage requested.

Note :

Minimum earned premium may apply to this policy. See attached carrier quote for specifics. Please note that all fees are fully earned at inception.

TRIA coverage if applicable is offered on the attached carrier's quote.

Please review any minimum and deposit, audit, and/or cancellation provisions on the attached carrier quote for details regarding possible return premiums and additional premium charges.

I look forward to hearing from you, and please call if you have any questions.

Thank you for your business.

Regards,

Tom Mullins
President
RT Specialty
Tom.Mullins@rtspecialty.com
312-878-8318

Kevin Verkler
Vice President
RT Specialty
kevin.verkler@rtspecialty.com
312-761-1053

RYAN® TURNER SPECIALTY

RT Specialty
540 West Madison St
9th Floor
Chicago, IL 60661
Tom Mullins
312-878-8318

# Insurance Proposal

## Cost Summary

| | |
|---|---|
| General Liability Premium | $19,750.00 |
| Policy Fee | $500.00 |
| Inspection Fee | $160.00 |
| CA Surplus Lines Tax | $597.30 |
| CA Stamp Fee | $35.84 |
| **Total Policy Cost** | **$21,043.14** |

**Minimum Earned**

Note: There may be a minimum earned on this policy. Please refer to the carrier quote for more details on the minimum earned percentage.

**Agent Commission: 11.00%**

**Disclosures**

RT Specialty is typically compensated through commission from the insurer for the placement of policies in most transactions. The amount of the commission varies by insurance line and by carrier. RT Specialty might also receive additional compensation. In order to place the insurance requested we may charge a reasonable fee for additional services such as performing a risk analysis, comparing policies, processing submissions, communication expenses, inspections, working with underwriters on the coverage proposal, issuing policies, or servicing the policy after issuance. Any fees charged are fully earned at inception of the policy. Third-party inspection or other fees may be separately itemized upon request. Our fees are applied to new policies, renewal policies, and endorsements. Fees applicable to each renewal and endorsement will be set forth in the quotes. It is the insurance carrier's decision whether to offer the insurance quoted, and your client's decision whether to accept the quote. Our fee is not imposed by state law or the Insurer.

Depending upon the Insurer involved with your placement, we might also have an agreement with the Insurer that we are proposing for this placement that might pay us future additional compensation This compensation could be based on formulas that consider the volume of business placed with the Insurer, the profitability of that business, how much of the business is retained for the Insurer's account each year, and potentially other factors. The agreements frequently consider total eligible premium from all clients placed during a calendar year and any incentive or contingent compensation is often received at a future date. Because of variables in these agreements, we often do not have an accurate means at the time of placement to determine the amount of any additional compensation that might be attributable to any single placement. You, as the retail broker with the direct relationship with the Insured, must comply with all applicable laws and regulations related to disclosure of and consent and agreement to, compensation, and informing the Insured that it may request more information about producer or broker compensation that might be paid in connection with the Insured's placement. If we request a copy of any legally required insured consent or agreement, you will provide us with a copy. If you need additional information about the compensation arrangements for services provided by RT Specialty affiliates, please contact your RT Specialty representative.

RT Specialty is a division of RSG Specialty, LLC. RSG Specialty, LLC is a Delaware limited liability company and a subsidiary of Ryan Specialty, LLC. In California: RSG Specialty Insurance Services, LLC (License # 0G97516).

RT Specialty
540 West Madison St
9th Floor
Chicago, IL 60661
Tom Mullins
312-878-8318

# Insurance Proposal

## Subjectivities

- Signed and completed Acord Application
- Due Diligence Forms (if required by state - Non-Admitted Only)
- Signed TRIA form if insured is accepting or rejecting terrorism coverage
- This quote is subject to receiving currently valued, acceptable loss runs for the last 5 policy terms prior to binding.
- Signed and completed Supplemental Application
- A written request to bind coverage is required prior to binding
- Please provide Inspection Contact Name and Phone Number at binding (email if available). Coverage is subject to a satisfactory inspection.

**The Subjectivities outlined above are required prior to binding. Please forward all requested information with your bind request. No coverage is considered bound until confirmed in writing and all subjectivities have been addressed.**

RT BINDING AUTHORITY

540 W. Madison, 8th Floor
Chicago, IL 60661
312-651-6214
-
-

| | |
|---|---|
| **Date:** | 5/18/2026 |
| **Attention:** | |
| **Agency:** | |
| **Regarding:** | Chino Central Group, LLC |
| **File Number:** | - |
| **Quoted By:** | Kevin Verkler |

# Insurance Quotation

| | |
|---|---|
| **Proposed Policy Period:** | 5/18/2026 to 5/18/2027 |
| **Issuing Carrier:** | Maxum Indemnity Company (Non-Admitted) **A.M. Best, Rating A+ XV** |
| **Primary Location:** | 12125 Central Avenue, 12125-12233, Chino, CA 91710-2421 |
| **Quote is Valid:** | Until 7/2/2026 |

We are pleased to offer the following quotation for coverage. Please review the attached quotation for accuracy. Our quotation reflects the coverages we are able to offer and may not always be exactly what you requested.

| | |
|---|---|
| General Liability | $19,750.00 |
| **Total** | **$19,750.00** |
| Commission | |

Terrorism Coverage as provided by the Federal Terrorism Risk Insurance Act can be obtained for an additional premium of $988, plus applicable taxes and fees.

**Remarks:**

The minimum earned premium is 25%.

This policy is subject to audit. In order to bind coverage, we must receive a written request by 7/2/2026.

**DISCLAIMER:**

This quotation is being offered on the basis shown above. It does not necessarily provide the terms, conditions and/or policy coverages requested in your submission. It is your responsibility as the insured's agent to review this quote to determine coverage adequacy.

Thank you for the opportunity to quote your business.

Kevin Verkler

Assistant Vice President

RSG Specialty LLC (Chicago, IL)
540 W. Madison, 8th Floor
Chicago, IL 60661

**Date:** 5/18/2026
**Regarding:** Chino Central Group, LLC
**Quoted By:** Kevin Verkler

## General Liability Quote

**Limits**

| | |
|---|---|
| **General Aggregate Limit** | $2,000,000 |
| **Products-Completed Operations Aggregate Limit** | Subject to General Aggregate |
| **Personal and Advertising Injury Limit** | $1,000,000 Each Occurrence |
| **Each Occurrence Limit** | $1,000,000 |
| **Damages to Premises Rented to You Limit** | $100,000 Per Location |
| **Medical Expenses Limit** | $5,000 Per Person |

| | |
|---|---|
| **Deductible** | None |
| **Defense** | In Addition to Limits |
| **Defense included in deductible** | Yes |
| **Deductible shall reduce policy limits** | No |

| Loc/St/Terr | Class Code No. | Classification | Exposures | PremOp Rate | Prod/CO Rate | Advanced Premium |
|---|---|---|---|---|---|---|
| 1/CA/006 | 46606 | Parking - public - shopping centers - maintained by lessee - (lessor's risk only) | a) 140,000 | 49.253 | INCL | $6,895 |
| 1/CA/006 | 61217 | Buildings or Premises - bank or office - mercantile or manufacturing - maintained by the insured (Lessor's risk only) (For-Profit) | a) 104,406 | 123.129 | INCL | $12,855 |

**Additional Coverages**

| Coverage | Notes | Exposures | Premium |
|---|---|---|---|
| E1245 Assault And Battery Coverage Sublimit - General Liability - $25,000/$50,000 Limit | | 1 | INCL |
| CG2005 Additional Insured - Controlling Interest | **FULLY EARNED** | 1 | INCL |
| | **Line of Business Subtotal Premium:** | | $19,750 |

**Legend** a) Area c) Cost m) Admissions p) Payroll s) Sales o) Other u) Units t) Each

RSG Specialty LLC (Chicago, IL)
540 W. Madison, 8th Floor
Chicago, IL 60661

**Date:** 5/18/2026
**Regarding:** Chino Central Group, LLC
**Quoted By:** Kevin Verkler

# Policy Forms

**Policy Level Forms**

| Form # | Form Description |
|---|---|
| PJ (1/1/2003) | Policy Jacket |
| DECC (1/1/2003) | Common Policy Declarations |
| D-2 (1/1/2020) | California Notice |
| E048 (1/2/2003) | Minimum Earned Premium |
| E1233 (1/1/2015) | Exclusion - Terrorism |
| E142 (5/1/2021) | Service of Suit, California |
| E849 (3/1/2010) | Forms and Endorsements Schedule |
| IL0021 (7/1/2002) | Nuclear Energy Liability Exclusion (Broad Form) |
| MISC001 (7/1/2023) | Claims Reporting |

**Commercial General Liability Forms**

| Form # | Form Description |
|---|---|
| DECBGL (7/1/2005) | Commercial General Liability Coverage Part Declarations |
| CG0001 (12/1/2025) | Commercial General Liability Coverage Form |
| CG0069 (12/1/2023) | Exclusion – Violation of Law Addressing Data Privacy |
| CG2005 (4/1/2013) | Additional Insured - Controlling Interest |
| CG2107 (5/1/2014) | Exclusion - Access Or Disclosure Of Confidential Or Personal Information And Data-Related Liability - Limited Bodily Injury Exception Not Included |
| CG2109 (6/1/2015) | Exclusion - Unmanned Aircraft |
| CG2132 (5/1/2009) | Communicable Disease Exclusion |
| CG2147 (12/1/2007) | Employment-Related Practices Exclusion |
| CG2165 (12/1/2004) | Total Pollution Exclusion With A Building Heating, Cooling And Dehumidifying Equipment Exception And A Hostile Fire Exception |
| CG2167 (12/1/2004) | Fungi or Bacteria Exclusion |
| CG2426 (7/1/2004) | Amendment Of Insured Contract Definition |
| CG9909 (12/1/2019) | Premium Audit Noncompliance Charge |
| E1226 (8/1/2014) | Limitation Of Coverage To Designated Premises Or Project |
| E1245 (3/1/2015) | Assault And Battery Coverage Sublimit - General Liability |
| E1432 (5/1/2024) | Perfluoroalkyl and Polyfluoroalkyl Substances |
| E1436 (5/1/2025) | Exclusion – Endocrine Disruptors |
| E1439 (2/1/2026) | Exclusion - Uninsured / Underinsured Commercial Tenants |
| E713 (8/1/2007) | Exclusion - Punitive or Exemplary Damages |

RSG Specialty LLC (Chicago, IL)
540 W. Madison, 8th Floor
Chicago, IL 60661

**Date:** 5/18/2026
**Regarding:** Chino Central Group, LLC
**Quoted By:** Kevin Verkler

| Form # | Form Description |
|---|---|
| E861 (6/1/2024) | Total Liquor Exclusion |
| E868 (9/1/2017) | Exclusion/Limitations - Combination Endorsement |
| Contains: | |
| E673 (07/01/2012) | Exclusion – Professional Services |
| E687 (09/01/2010) | Exclusion – Asbestos, Silica and Silica Dust |
| E711 (09/01/2010) | Exclusion – Lead |
| E831 (09/01/2010) | Exclusion – Breach of Contract |
| E763 (01/01/2009) | Cross Suits Exclusion |
| CG2154 (01/01/1996) | Exclusion – Designated Operations Covered By a Consolidated (Wrap-Up) Insurance Program |
| E714 (08/01/2007) | Exclusion – Unfair Competition |
| E348 (01/01/2003) | Amendment Deposit Premium and Minimum Premium |
| E704 (08/01/2007) | Amendment Premium Audit |
| E829 (01/01/2010) | Definition – Damages |

# The Hartford fact sheet

**Purpose-driven insurance leader.** The Hartford is a leader in property and casualty insurance, group benefits and mutual funds. We are proud to be widely recognized for our customer service excellence, sustainability practices, trust and integrity.

## The Hartford's businesses

**Business Insurance**

- Workers' Compensation
- Property
- General Liability
- Management & Professional Liability
- Umbrella & Excess
- Auto

Plus other specialized coverages including Bond, Credit & Political Risk, Cyber, Environmental, Inland and Ocean Marine, Multinational and more.

*The Hartford also offers wholesale solutions through Navigators, a brand of The Hartford, and assumed reinsurance coverage through Navigators Re.*

**Personal Lines**
- Auto
- Home
- Renters
- Umbrella

**Employee Benefits**

- Absence Management
- Group Income Protection Benefits, Life Insurance, Accidental Loss of Life and Severe Injury Benefits, and Accident & Health[1]
- Group Retiree Health
- Voluntary Benefits, including Critical Illness, Accidental Injury and Hospital Cash Benefits[1]

**Hartford Funds**

- Broad range of exchange-traded funds: both strategic beta and active ETFs
- Equity, fixed income and asset allocation mutual funds subadvised by Wellington Management and Schroders

The Hartford

## Key facts

- Founded: 1810
- Employees: approximately 19,100
- Headquarters: Hartford, Connecticut
- The Hartford insures more than 1 million small businesses.
- Sells products primarily through a network of independent agents and brokers.
- Only nationally endorsed direct auto and home insurance program for AARP's nearly 38 million members.

## Our history



- The Hartford's trademark logo echoes the majestic stag depicted in Sir Edwin Landseer's 1851 painting Monarch of the Glen.
- The Hartford provided insurance for the only home Abraham Lincoln ever owned.



- Babe Ruth purchased a policy from The Hartford in 1920 for protection against disability.
- Since 1947, more than 112 million children have been deputized as part of the company's Junior Fire Marshal® program – one of the oldest corporate-sponsored public education programs in the country.



- The Golden Gate Bridge opened in 1937. Construction of the bridge was bonded by The Hartford.

## Financial highlights
(as of 12/31/2024)

**$26.5B** Revenues

**$16.4B** Total stockholders' equity

## Market rankings

**# 1** in fully insured disability inforce[2]

**# 2** workers' compensation insurer, based on direct written premiums[3]

**# 2** commercial multi-peril carrier, based on direct written premiums[3]

**# 3** in fully insured disability sales[2]

**# 3** combined fully insured life and disability inforce[2]

| Financial strength | A.M. Best | Moody's | S&P |
|---|---|---|---|
| Hartford Fire Insurance Company | A+ | A1 | A+ |
| Hartford Life and Accident Insurance Company | A+ | A1 | A+ |
| Navigators Insurance Company | A+ | NR | A+ |

- Hartford Fire Insurance Company and Hartford Life and Accident Insurance Company ratings are on stable outlook at A.M. Best, Moody's and Standard and Poor's
- Navigators Insurance Company ratings are on stable outlook at A.M. Best and Standard and Poor's

NR – Not rated

## 2024 total premiums

**$22.6B** Total premium all business segments

**$6.4B** Group Benefits fully insured ongoing premiums

## Total mutual funds segment assets under management

**$139.6B**

## P&C written premiums

**$16.9B**




[1] Group Income Protection Benefits (also known as Group Disability), Accidental Loss of Life and Severe Injury Benefits (also known as Accidental Death and Dismemberment), Accidental Injury (also known as Accident Insurance), Hospital Cash Benefits (also known as Hospital Indemnity).

[2] LIMRA year-end 2023 survey.

[3] S&P Global Data, 2024.

[4] Commercial Lines written premiums include immaterial amounts from Other Commercial.

The Hartford Insurance Group, Inc., (NYSE: HIG) operates through its subsidiaries, under the brand name, The Hartford® For more details about The Hartford Insurance Group, Inc., refer to our most recent Form 10-K and/or 10-Q and the other filings we make with the Securities and Exchange Commission. All of these are available at the Investor Relations section of The Hartford's website: https://ir.TheHartford.com. Current financial information can also be obtained from the latest Investor Financial Supplement accessible through the Investor Relations website. We assume no obligation to update this fact sheet, which speaks as of the dates indicated.

24-EX-2994750 © April 2025 The Hartford

**Insurance Company:** Maxum Indemnity Company

**Named Insured:** Chino Central Group, LLC

# POLICYHOLDER DISCLOSURE STATEMENT
# UNDER TERRORISM RISK INSURANCE ACT

You are hereby notified that under the federal Terrorism Risk Insurance Act (the "Act"), as amended effective January 12, 2015, you have a right to purchase insurance coverage for losses resulting from acts of terrorism, as defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside of the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES [85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019; and 80% beginning on January 1, 2020] OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REINBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

**ACCEPTANCE OR REJECTION OF TERRORISM INSURANCE COVERAGE**

_____ I hereby elect to purchase terrorism coverage for a prospective premium of $988 .

_____ I hereby decline to purchase terrorism coverage for certified acts of terrorism. I understand that I will have no coverage for losses resulting from certified acts of terrorism.

| | |
|---|---|
| ____________________ | ____________________ |
| Signature of Insured | Insurance Company |
| ____________________ | ____________________ |
| Print Name/Title | Policy Number |
| ____________________ | |
| Date | |

**TRIA Selection Rejection (01-2015)**

# IMPORTANT NOTICE:

**1. The insurance policy that you are applying to purchase is being issued by an insurer that is not licensed by the State of California. These companies are called "nonadmitted" or "surplus line" insurers.**

**2. The insurer is not subject to the financial solvency regulation and enforcement that apply to California licensed insurers.**

**3. The insurer does not participate in any of the insurance guarantee funds created by California law. Therefore, these funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised.**

**4. The insurer should be licensed either as a foreign insurer in another state in the United States or as a non-United States (alien) insurer. You should ask questions of your insurance agent, broker, or "surplus line" broker or contact the California Department of Insurance at the toll-free number 1-800-927-4357 or internet website www.insurance.ca.gov. Ask whether or not the insurer is licensed as a foreign or non-United States (alien) insurer and for additional information about the insurer. You may also visit the NAIC's internet website at www.naic.org. The NAIC—the National Association of Insurance Commissioners—is the regulatory support organization created and governed by the chief insurance regulators in the United States.**

**5. Foreign insurers should be licensed by a state in the United States and you may contact that state's department of insurance to obtain more information about that insurer. You can find a link to each state from this NAIC internet website: https://naic.org/state_web_map.htm.**

**6. For non-United States (alien) insurers, the insurer should be licensed by a country outside of the United States and should be on the NAIC's International Insurers Department (IID) listing of approved nonadmitted non-United States insurers. Ask your agent, broker, or "surplus line" broker to obtain more information about that insurer.**

**7. California maintains a "List of Approved Surplus Line Insurers (LASLI)." Ask your agent or broker if the insurer is on that list, or view that list at the internet website of the California Department of Insurance: www.insurance.ca.gov/01-consumers/120-company/07-lasli/lasli.cfm.**

**8. If you, as the applicant, required that the insurance policy you have purchased be effective immediately, either because existing coverage was going to lapse within two business days or because you were required to have coverage within two business days, and you did not receive this disclosure form and a request for your signature until after coverage became effective, you have the right to cancel this policy within five days of receiving this disclosure. If you cancel coverage, the premium will be prorated and any broker's fee charged for this insurance will be returned to you.**

**Date: ____________________________**

**Insured: _________________________**

**D-1 (Effective January 1, 2020)**

# DILIGENT SEARCH REPORT

1.) ____________________________________________ hereby submits that he/she is:
(Full Name of the Individual)
(A) Duly licensed under California Department of Insurance license number ________;
**OR** (B) Duly licensed and authorized to act as an endorsee of the organizational license of
___________________________., California Department of Insurance license number _____________
(Name of the Organization)
and (C) that he/she or said organizational licensee was engaged by the insured named herein, or the insured's broker to obtain insurance as described in this report;
and (D) is the licensee who performed or supervised this diligent search.

---

2. (A) Name of Insured: ______________________________________________________

(B) Address of Insured: ______________________________________________________
(Street and Number)
_______________ California ___________________
(City) (State) (Zip Code)
(C) Description of Risk: ______________________________________________________
e.g. Laundromat, liquor store, NOT TYPE OF COVERAGE)
(D) Location of Risk: ______________________________________________________
(Street and Number)
_______________ California ______________________
(City) (State) (Zip Code)
(E) Type of Insurance coverage: ______________
(Enter Appropriate Code Number from Pg. 3)

---

3. If Private Passenger Automobile Liability Insurance is identified on line 2(E), complete the following.
(A) Does the insured qualify as a "Good Driver" under Section 1861.025 of the California Insurance Code?
(CHECK ONE) Yes [ ] NO [x]
(B) Does the coverage that you have placed include, in whole or in part, the limits of coverage provided under the California Automobile Assigned Risk Plan (CAARP)? (CHECK ONE) Yes [ ] NO [x]
.(C) If YES, has this risk been submitted to and found to be ineligible by CAARP?
(CHECK ONE) Yes [ ] NO [x]
If your answer is NO, then this coverage cannot be placed with a non-admitted insurer. (See Insurance Code section 1763.5)

---

4. If Health Insurance is identified on line 2(E), does the insured qualify as a "Small Employer" under Section 10700(x) of the California Insurance Code? (CHECK ONE) Yes [ ] NO [x]

---

5. If this insurance was placed pursuant to Section 125 et seq. of the California Insurance Code governing transactions with risk purchasing groups authorized by the Federal Liability Risk Retention Act of 1986, complete the following.

(A) Provide the name and address of the purchasing group of which the insured is a member __________________.
______________________________________________________________________.
______________________________________________________________________

6. (A) Describe the diligent efforts made to place this coverage with admitted insurers and describe how the search Was performed (please add additional pages if necessary): Admitted companies were contacted by phone.
______________________________________________________________________
______________________________________________________________________
______________________________________________________________________

(SL-2 (Revised 06/2004)

(B) If search was performed by someone other than the person named on line 1, please provide full name of that individual : _____

______________________________________________________________________________

______________________________________________________________________________

______________________________________________________________________________

7. (A) Was the risk described in Section 2 submitted by you or by someone under your supervision to at least (3) Insurers that are admitted in California and who actually write the type of insurance described on lines 2 (C) and 2 (E)? (CHECK ONE) Yes [ ] NO [x ]

(B) If YES, please complete ALL sections of the following table; if NO, skip to Section 8:

| Full Name of Admitted Company | First & last Name of Company Representative AND Telephone Number | Check if Employee (E) or Agent (A) | Month, Year of Declination | Declination Code* |
|---|---|---|---|---|
| 1. | (___) ____-____<br>Or "Online Declination" Website | E [ ]<br>A [ ] | - | |
| 2. | (___) ____-____<br>Or "Online Declination" Website | E [ ]<br>A [ ] | - | |
| 3. | (___) ____-____<br>Or "Online Declination" Website | E [ ]<br>A [ ] | - | |

*Declination Codes: 1 – Company's capacity reached 2 – underwriting reason 3 – refused to state 4 – other

______________________________________________________________________________

8. If 7(A) was answered NO, complete the following:

(A) Did you determine that fewer than 3 admitted insurers actually write the type of insurance described on lines (CHECK ONE) Yes [x] NO [ ]

(B) If NO, please explain in detail why the risk was submitted to less than three admitted insurers in California that write this type of insurance. ______________________________________________________________________________

______________________________________________________________________________

______________________________________________________________________________

(C) If YES, please describe how you made this determination: Past experience with this type of risk has found the admitted markets unwilling to provide the coverage needed by the insured due to underwriting reasons.

The undersigned licensee hereby certifies that this report is true and correct, and that this risk is not being placed with a non-Admitted insurer for the sole purpose of securing a rate or premium lower than the lowest rate or premium available from an Admitted insurer.

______________________________ ______________________
(Signature of Licensee Named on Line 1) (Date)

SL-2 (Revised 06/2004)

STETSON
INSURANCE FUNDING

We are pleased to introduce you to Stetson Insurance Funding, LLC ("Stetson") an affiliate of Ryan Specialty Group that operates its premium finance business. Stetson will be providing an automated premium finance agreement for your clients' commercial insurance risks placed through RT Specialty.

Stetson has teamed up with FIRST Insurance Funding ("FIRST"), the largest premium finance company in North America. Under this collaboration, FIRST will be the lender, as listed on the premium finance agreement, and the loan will be serviced by FIRST. Stetson will be your main point of contact throughout the life of the loan and provide ongoing support to your agency.

## EASY SET UP FOR AGENTS TO OBTAIN FINANCING:

1. Receive an automated premium finance agreement with eligible commercial insurance risks placed through RT Specialty.
2. Make changes to the premium finance agreement by:
   - Visiting our website at www.stetsonfunding.com
   - Emailing us at quotes@stetsonfunding.com
   - Calling us at 1-866-856-1112
3. Down payment to be collected by the agent from the insured in good funds and sent to the General Agent or Carrier.
4. Return the signed premium finance agreement to agreements@stetsonfunding.com.
5. Stetson will finalize the loan and have funding issued for the amount financed.

We look forward to exceeding your premium financing expectations.

# IMPORTANT NOTICE:

**1. The insurance policy that you are applying to purchase is being issued by an insurer that is not licensed by the State of California. These companies are called "nonadmitted" or "surplus line" insurers.**

**2. The insurer is not subject to the financial solvency regulation and enforcement that apply to California licensed insurers.**

**3. The insurer does not participate in any of the insurance guarantee funds created by California law. Therefore, these funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised.**

**4. The insurer should be licensed either as a foreign insurer in another state in the United States or as a non-United States (alien) insurer. You should ask questions of your insurance agent, broker, or "surplus line" broker or contact the California Department of Insurance at the toll-free number 1-800-927-4357 or internet website www.insurance.ca.gov. Ask whether or not the insurer is licensed as a foreign or non-United States (alien) insurer and for additional information about the insurer. You may also visit the NAIC's internet website at www.naic.org. The NAIC—the National Association of Insurance Commissioners—is the regulatory support organization created and governed by the chief insurance regulators in the United States.**

**5. Foreign insurers should be licensed by a state in the United States and you may contact that state's department of insurance to obtain more information about that insurer. You can find a link to each state from this NAIC internet website: https://naic.org/state_web_map.htm.**

**6. For non-United States (alien) insurers, the insurer should be licensed by a country outside of the United States and should be on the NAIC's International Insurers Department (IID) listing of approved nonadmitted non-United States insurers. Ask your agent, broker, or "surplus line" broker to obtain more information about that insurer.**

**7. California maintains a "List of Approved Surplus Line Insurers (LASLI)." Ask your agent or broker if the insurer is on that list, or view that list at the internet website of the California Department of Insurance: www.insurance.ca.gov/01-consumers/120-company/07-lasli/lasli.cfm.**

**8. If you, as the applicant, required that the insurance policy you have purchased be effective immediately, either because existing coverage was going to lapse within two business days or because you were required to have coverage within two business days, and you did not receive this disclosure form and a request for your signature until after coverage became effective, you have the right to cancel this policy within five days of receiving this disclosure. If you cancel coverage, the premium will be prorated and any broker's fee charged for this insurance will be returned to you.**

**Date: ____________________________**

**Insured: __________________________**

**D-1 (Effective January 1, 2020)**

# INSTRUCTIONS

**SECTION 1:** Please provide the full name, as it is written on the individual's California license, of the individual who performed or supervised the diligent search. If the search was performed under the individual's license number, enter the individual's California license number in section (A) or if the individual was authorized as an endorsee under an organizational license, enter the name of the organization and its California license number in section (B).

**SECTION 3:** Please provide a complete response to section (A), and if applicable to section (B). Note: The Insurance Commissioner or his designee may require the surplus line broker to conduct additional searches among admitted insurers for similar placements in the future. (California Insurance Code section 1763[b]) An incomplete response will be tagged and may unnecessarily result in a request for a further search to be conducted.

- **SECTION 3(A):** To avoid misidentification among insurers with similar names, please provide the complete name of the admitted insurer as listed in the California Department of Insurance (CDI) Official Publication of Admitted Companies and the insurance company's National Association of Insurance Commissioners (NAIC) number. Please include Insurer contact name and telephone number or email address, or if a website based quoting platform was used, enter the website name.

  Please refer to the California Department of Insurance Official Publication of Admitted Companies.
  https://interactive.web.insurance.ca.gov/apex_extprd/f?p=144:1

- **SECTION 3(B):** The detailed explanation in section 3(B) must include a description of the steps the broker took to determine whether three insurers write the type of insurance or risk and the reasoning for the determination. A conclusory statement is insufficient.

**SIGNATURE:** The Surplus Line Association of California (SLA) will accept a wet signature or a digital and electronic signature from the California Secretary of State's Approved List of Digital Signature Certification Authorities. Please refer to the following link:

https://www.sos.ca.gov/administration/regulations/current-regulations/technology/digital-signatures/approved-certification-authorities/

**IMPORTANT:** Persons who are licensed only as an agent are authorized to offer risks only to admitted insurers for which they are appointed agents (California Insurance Code section 1704). Agents are not authorized to offer a risk to admitted insurers for which they are not appointed agents. A search which is limited to only those companies that have appointed the agent may not necessarily constitute a diligent search of the admitted market.

**WHAT TO FILE:** This report must be filed along with the Confidential Report of Surplus Line Placement. (SL-1 Form). File this Form with signature, and, only if applicable, the Addendum.

**WHERE TO FILE:** The SL-1 Form and this report are to be filed by the surplus line broker with SLA within 60 days of placement of coverage with non-admitted insurer(s).

**MULTIPLE LICENSEES CONDUCTING SEARCH:** If two or more licensees conduct a diligent search of admitted insurers, then each licensee must complete a Diligent Search Report (SL-2 Form). All such reports should be attached to the SL-1 Form.

Please refer to the **Coverage Code List** and **Export Code List** under Resources on the Learning Center for the full list of coverages and their respective codes.

https://learningcenter.slacal.com/resources/filing-requirements-and-procedures/coverage-codes
https://learningcenter.slacal.com/resources/filing-requirements-and-procedures/export-list-codes

The Surplus Line Association of California

# DILIGENT SEARCH REPORT (SL-2 FORM)

**①**

Before completing this report, please review the instructions on page 2.

I, ______________________________________, hereby submit that I performed or supervised this diligent search, and I am:

***(A)*** licensed as an individual agent-broker for the applicable lines of insurance or surplus line broker under California license number _______________; **OR**

***(B)*** licensed and an endorsee on the license of ______________________________ (**Full Name of Organization**), California license number ______________________________

**②**

***(A)*** Name of Insured: Chino Central Group LLC

***(B)*** Description of Risk: ______________________________
(e.g., Tattoo Parlor, Cannabis Dispensary, Vacant Building, **NOT TYPE OF COVERAGE**)

***(C)*** Type of Insurance or Coverage Code: ______________________________

**③**

Describe the diligent efforts made to place this coverage with admitted insurers by completing (A) or, if applicable, (B) below.

***(A)*** List the insurers admitted in California who actually write the type of insurance described on lines 2(B) and 2(C) to which you or someone under your supervision submitted the risk described in lines 2(A) through 2(C). Please complete **ALL** sections of the table below.

| | INSURER ① | INSURER ② | INSURER ③ |
|---|---|---|---|
| NAIC ID | | | |
| MONTH, YEAR OF DECLINATION | | | |
| FULL NAME OF ADMITTED INSURER | | | |
| CONTACT INFORMATION — FULL NAME | | | |
| PHONE / EMAIL | | | |
| *OR* WEBSITE | | | |

***(B)*** If you did not list at least three insurers in 3(A) above, describe in detail how you determined that fewer than **THREE** admitted insurers write the type of insurance described on lines 2(B) and 2(C). ______________________________

______________________________________________________________

**④**

Is the type of insurance you are reporting as identified in line 2(C) **private passenger automobile liability or health**? Yes ☐ No ☐

If you answered "yes," please complete the Diligent Search Report Addendum.

The undersigned licensee hereby certifies that this report is true and correct, and that this risk is not being placed with a non-admitted insurer for the sole purpose of securing a rate or premium lower than the lowest rate or premium available from an admitted insurer.

______________________________ (Signature of Licensee Named on Line 1)

______________________________ (Date)

# DILIGENT SEARCH REPORT (SL-2 FORM) ADDENDUM

## PRIVATE PASSENGER AUTOMOBILE LIABILITY INSURANCE COVERAGE OR HEALTH INSURANCE COVERAGE

1. If **Private Passenger Automobile Liability Insurance** is identified on line 2(C), complete the following:

   (A) Does the insured qualify as a "Good Driver" under Section 1861.025 of the California Insurance Code?
   https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=INS&sectionNum=1861.025.

   **(CHECK ONE) YES** ☐ **NO** ☐

   (B) Does the coverage that you have placed include, in whole or in part, the limits of coverage provided under the California Automobile Assigned Risk Plan (CAARP)?

   **(CHECK ONE) YES** ☐ **NO** ☐

   If YES, has this risk been submitted to and found to be ineligible by CAARP?

   **(CHECK ONE) YES** ☐ **NO** ☐

   If your answer is NO, this coverage cannot be placed with a non-admitted insurer.
   (See California Insurance Code section 1763.5)
   https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=INS&sectionNum=1763.5.

2. If **Health Insurance** is identified on line 2(C), does the insured qualify as a "Small Employer" under

   California Insurance Code section 10700(x)?
   https://leginfo.legislature.ca.gov/faces/codes_displayText.xhtml?lawCode=INS&division=2.&title=&part=2.&chapter=8.&article=1.

   **(CHECK ONE) YES** ☐ **NO** ☐

RYAN® TURNER SPECIALTY

RT Specialty
540 West Madison St
9th Floor
Chicago, IL 60661
Tom Mullins
312-878-8318

# Insurance Proposal

**May 20, 2026**

**Trustee Insurance Agency**
Attn: Jessica Cox
PO Box 190 Vicksburg, MI 49097

**Applicant:** Chino Central Group LLC
520 Newport Center Dr Ste 480
Newport Beach, CA 92660

**Submission #:** APP114611274
**Policy Period:** 06/01/2026 12:01 AM To 05/28/2027 12:01 AM
**Coverage:** Property
**Issuing Company:** Certain Underwriters at Lloyd's, London

---

**CALIFORNIA SHORT RATE CANCELLATION PENALTY DISCLOSURE**

Please be advised that if you request cancellation of your policy prior to the expiration, the policy may be cancelled at a rate less than pro rata.

Please refer to your policy for specific terms and conditions.

# EXHIBIT 2

RYAN® TURNER SPECIALTY

RT Specialty
540 West Madison St
9th Floor
Chicago, IL 60661
Tom Mullins
312-878-8318

# Insurance Proposal

**May 20, 2026**

**Trustee Insurance Agency**
Attn: Jessica Cox
PO Box 190 Vicksburg, MI 49097

| | |
|---|---|
| **Applicant:** | Chino Central Group LLC<br>520 Newport Center Dr Ste 480<br>Newport Beach, CA 92660 |
| **Submission #:** | APP114611274 |
| **Policy Period:** | 06/01/2026 12:01 AM To 05/28/2027 12:01 AM |
| **Coverage:** | Property |
| **Issuing Company:** | Certain Underwriters at Lloyd's, London |

---

We are pleased to submit our proposal for the above captioned applicant.

Please read the attached quote carefully as coverage offered may be more limited than coverage requested.

Note :

Minimum earned premium may apply to this policy. See attached carrier quote for specifics. Please note that all fees are fully earned at inception.

TRIA coverage if applicable is offered on the attached carrier's quote.

Please review any minimum and deposit, audit, and/or cancellation provisions on the attached carrier quote for details regarding possible return premiums and additional premium charges.

I look forward to hearing from you, and please call if you have any questions.

Thank you for your business.

Regards,

Tom Mullins
President
RT Specialty
Tom.Mullins@rtspecialty.com
312-878-8318

Kevin Verkler
Vice President
RT Specialty
kevin.verkler@rtspecialty.com
312-761-1053

RT RYAN® TURNER SPECIALTY

RT Specialty
540 West Madison St
9th Floor
Chicago, IL 60661
Tom Mullins
312-878-8318

# Insurance Proposal

## Cost Summary

| | |
|---|---|
| Property Premium | $90,346.76 |
| CA Surplus Lines Tax | $2,760.62 |
| CA Stamp Fee | $165.64 |
| Carrier Inspection Fee | $600.00 |
| Policy Fee | $1,000.00 |
| Carrier Policy Fee | $1,073.81 |
| **Total Policy Cost** | **$95,946.83** |

**Minimum Earned**

Note: There may be a minimum earned on this policy. Please refer to the carrier quote for more details on the minimum earned percentage.

**Agent Commission: 10.00%**

**Disclosures**

RT Specialty is typically compensated through commission from the insurer for the placement of policies in most transactions. The amount of the commission varies by insurance line and by carrier. RT Specialty might also receive additional compensation. In order to place the insurance requested we may charge a reasonable fee for additional services such as performing a risk analysis, comparing policies, processing submissions, communication expenses, inspections, working with underwriters on the coverage proposal, issuing policies, or servicing the policy after issuance. Any fees charged are fully earned at inception of the policy. Third-party inspection or other fees may be separately itemized upon request. Our fees are applied to new policies, renewal policies, and endorsements. Fees applicable to each renewal and endorsement will be set forth in the quotes. It is the insurance carrier’s decision whether to offer the insurance quoted, and your client’s decision whether to accept the quote. Our fee is not imposed by state law or the Insurer.

Depending upon the Insurer involved with your placement, we might also have an agreement with the Insurer that we are proposing for this placement that might pay us future additional compensation This compensation could be based on formulas that consider the volume of business placed with the Insurer, the profitability of that business, how much of the business is retained for the Insurer’s account each year, and potentially other factors. The agreements frequently consider total eligible premium from all clients placed during a calendar year and any incentive or contingent compensation is often received at a future date. Because of variables in these agreements, we often do not have an accurate means at the time of placement to determine the amount of any additional compensation that might be attributable to any single placement. You, as the retail broker with the direct relationship with the Insured, must comply with all applicable laws and regulations related to disclosure of and consent and agreement to, compensation, and informing the Insured that it may request more information about producer or broker compensation that might be paid in connection with the Insured’s placement. If we request a copy of any legally required insured consent or agreement, you will provide us with a copy. If you need additional information about the compensation arrangements for services provided by RT Specialty affiliates, please contact your RT Specialty representative.

RT Specialty is a division of RSG Specialty, LLC. RSG Specialty, LLC is a Delaware limited liability company and a subsidiary of Ryan Specialty, LLC. In California: RSG Specialty Insurance Services, LLC (License # 0G97516).

RYAN® TURNER SPECIALTY

RT Specialty
540 West Madison St
9th Floor
Chicago, IL 60661
Tom Mullins
312-878-8318

# Insurance Proposal

## Subjectivities

- Signed and completed Acord Application
- Due Diligence Forms (if required by state - Non-Admitted Only)
- Signed TRIA form if insured is accepting or rejecting terrorism coverage
- This quote is subject to receiving currently valued, acceptable loss runs for the last 5 policy terms prior to binding.
- Signed and completed Supplemental Application
- A written request to bind coverage is required prior to binding
- Please provide Inspection Contact Name and Phone Number at binding (email if available). Coverage is subject to a satisfactory inspection.
- Subjectivities & conditions per the Amalgamated quote letter.

**The Subjectivities outlined above are required prior to binding. Please forward all requested information with your bind request. No coverage is considered bound until confirmed in writing and all subjectivities have been addressed.**

RYAN® TURNER SPECIALTY

RT Specialty
540 West Madison St
9th Floor
Chicago, IL 60661
Tom Mullins
312-878-8318

# Insurance Proposal

---

## NOTICE

## Occurrence Limit of Liability

## (OLLE) Scheduled Limits

Blanket coverage for first-party property insurance risks has become increasingly difficult to secure and often is not available regardless of price.

Please note that your quote may not provide coverage on a blanket basis and, based on current market conditions, a blanket coverage option might not be available. Any reference(s) to an Occurrence Limit of Liability Endorsement (OLLE), margin clause, maximum amount payable, and/or scheduled limits indicate that blanket coverage is not provided. Instead, the amount of recovery afforded by the policy is limited in some respect to the amount(s) set forth on the Statement of Values (SOV) provided to the insurer. This potentially can materially reduce the insured's recovery in the event of a loss as compared to blanket coverage. Additionally, the policy language for these clauses may vary by insurer and some insurers limit the amount recoverable for extensions of coverage, additional coverages, and additional covered property to the values as shown on the SOV.

Please review this quote very carefully to determine if coverage is being offered or provided on a blanket, or some other more limited, basis.

As such, we strongly recommend that you confirm that the insured is in agreement that they have provided full and accurate amounts for the values set forth on the SOV. RT Specialty expressly disclaims any responsibility for the accuracy or adequacy of the values provided on an SOV. We also note that all decisions concerning coverage and the application of the terms, provisions, conditions, limitations or exclusions of the policy to any claim are made exclusively by the insurers.

AMALGAMATED Insurance Underwriters

# Commercial Insurance Proposal

AMALGAMATED INSURANCE UNDERWRITERS LLC
AS PROGRAM MANAGERS
FOR

## Chino Central Group, LLC

520 Newport Center Dr, Ste 480
Newport Beach CA 92660
United States

**Proposed Coverage Period:**

**06/01/2026 - 05/28/2027**

**Amalgamated Insurance Underwriters**
**as Program Managers**
**1 Paragon Drive, Suite 200**
**Montvale, NJ 07645**
**Direct Phone: 845-426-0400**
**Visit us at: www.aiu-usa.com**

May 19, 2026

AIU AMALGAMATED Insurance Underwriters

**a·mal·ga·mate [əˈmalgəˌmāt/]**
Combine or unite to form one organization or structure

## Risk Manager:

AIU AMALGAMATED Insurance Underwriters

## Master Named Insured:

ALCM AMALGAMATED Loss Control Management

AMALGAMATED LOSS CONTROL MANAGEMENT, LLC

## Retail Agent:

Ryan Turner Specialty, LLC - IL
540 W Monroe 9th Floor
Chicago, IL 60661
Attn: Kevin Verkler
Phone: (224) 545-6515

AIU AMALGAMATED Insurance Underwriters

# Property Coverage Details:

**Named Insured:** **Amalgamated Loss Control Management, LLC,** and any subsidiary, associated or affiliated company, corporation, firm, organization, partnership, joint venture or individual as exists now or is hereafter constituted or acquired, and any other party or interest that is required by contract or other agreement to be named.

**Mailing Address:** 800 West Main Street, Ste 1460, Boise, ID 83702

**Master Policy Term:** 05/28/2026-05/28/2027
**Policy Territory:** United States of America and its Territories
**Program Policy Limit:** $1,000,000,000
**Carriers:** A consortium of carriers with AM Best Rating A- or better.

**Property Covered**: All Real and Business Personal Property, Business Income/Rental Value, Improvements and Betterments, Contingent Business Interruption, Extended Period of Indemnity, Unnamed Locations, Automatic Acquisition, Property in the Course of Construction, Property in Transit, EDP Equipment/Media/Extra Expense, and as more fully defined in the policy wording.

**Perils Insured:** "All Risk" of direct physical loss or damage including Flood, and Earthquake, Boiler & Machinery, and Terrorism. **EXCLUDES** Earthquake in the State of California, Alaska, Hawaii, Nevada, and Pacific Northwest Seismic Zone. Excludes Loss due to Virus or Bacteria.

**Program Limit:** **$1,000,000,000 Shared Limit Program** per Occurrence RCV Basis, Other than roofs older than 20 years which will be subject to ACV Basis.

**Sublimit(s):** All sub limits are per occurrence unless otherwise noted:

| Program Sublimit(s) | Type of Loss, Cause of Loss and Coverage |
|---|---|
| $250,000,000 | EARTH MOVEMENT (Annual Aggregate) Subject to a maximum of $5,000,000, or Total Insurable Value as stated on the Schedule of Values (whichever is less), per location per occurrence, except; |
| $100,000,000 | EARTH MOVEMENT for locations in the **New Madrid Seismic Zone** (Annual Aggregate) Subject to a maximum of $5,000,000, or Total Insurable Value as stated on the Schedule of Values (whichever is less), per location per occurrence, |
| Excluded | EARTH MOVEMENT in the states of CA, AK, HI, NV, and Pacific Northwest Seismic Zone |
| Included | Loss or damage from resulting fire or explosion as a result of an EARTH MOVEMENT; Subject to a maximum of $10,000,000, or Total Insurable Value as stated on the Schedule of Values (whichever is less), per location per occurrence |
| Included | NAMED WINDSTORM except; |
| Excluded | NAMED WINDSTORM at locations in the State of **Florida** and locations in the **Critical US Named Windstorm Areas** |
| $250,000,000 | FLOOD (Annual Aggregate) Subject to a maximum of $10,000,000, or Total Insurable Value as stated on the Schedule of Values (whichever is less), per location per occurrence, except; |
| $50,000,000 | FLOOD in High Hazard Flood Zones (Annual Aggregate) Subject to a maximum of $10,000,000, or Total Insurable Value as stated on the Schedule of Values (whichever is less), per location per occurrence. |
| $5,000,000 | **Accounts Receivable** |
| $500,000 | **Commissions, Licensing Fees and Royalties** |
| Excluded | **Contingent Time Element** |
| $2,500,000 | **Data Restoration** – Property Damage and Time Element combined |
| $50,000,000 | **Debris Removal** – or 25% of the combined Property Damage and Time Element at the Location damaged, whichever is less subject to a maximum of $10,000,000 per location per occurrence |
| Included | **Demolition and Increased Cost of Construction** – Coverage A |
| $50,000,000 | **Demolition and Increased Cost of Construction** – Coverage B; subject to a maximum of $10,000,000 per location per occurrence |
| $50,000,000 | **Demolition and Increased Cost of Construction** – Coverage C; subject to a maximum of $10,000,000 per location per occurrence |
| $10,000,000 | **Demolition and Increased Cost of Construction –** Coverage D; subject to a maximum of $500,000 per location per occurrence |
| Included | **Earthquake Sprinkler Leakage** |

AIU AMALGAMATED Insurance Underwriters

| | |
|---|---|
| $25,000,000 | **Errors and Omissions** |
| $250,000 | **Exhibitions, Expositions, Fairs or Trade Shows** |
| $5,000,000 | **Expediting Expenses** |
| $50,000,000 | **Extra Expenses** |
| $250,000 | **Fine Arts** subject to a maximum of $10,000 per item |
| $250,000 | **Fire and Police Department Service Charges** |
| Included | **Gross Earnings** |
| $5,000,000 | **Ingress/Egress** |
| $100,000 | **Land and Water Contaminants Clean Up, Removal and Disposal** (Annual Aggregate) |
| $250,000 | **Land Improvements**; not to exceed $10,000 per Item maximum |
| $1,000,000 | **Leasehold Interest** |
| $250,000 | **Lightning/Wind/Hail Damage** to Electrical and Technology-related Equipment |
| $25,000,000 | **Miscellaneous Unnamed Locations** |
| $100,000 | **Mold** ensuing from an Insured cause of loss; Annual Aggregate |
| $10,000,000 | **On Site Construction** |
| $70,000,000 | **Newly Acquired Property** |
| $5,000,000 | **Outdoor Property** subject to a maximum of $100,000 per location and $1,000 per item |
| $50,000,000 | **Order of Civil or Military Authority** subject to $2,500,000 per location |
| $500,000 | **Professional Fees** |
| Excluded | **Radioactive Contamination** |
| Included | **Rental Insurance** |
| $50,000,000 | **Service Interruption** – Property Damage and Time Element combined, subject to a maximum of $5,000,000 per location |
| $1,000,000 | **Sewer & Drain Water Backup** |
| $500,000 | **Temporary Removal of Property** |
| $10,000,000 | **Tenant Relocation and Move-Back Expenses** subject to a maximum of $250,000 per location per occurrence |
| $250,000 | **Transportation** – Property Damage and Time Element Combined |
| $5,000,000 | **Valuable Papers and Records** |
| $100,000,000 | **Boiler & Machinery** |
| $100,000,000 | **Terrorism** |
| Excluded | **Vacant Property** |

AIU AMALGAMATED Insurance Underwriters

**Time Limit(s):** All time limits are consecutive calendar days unless noted otherwise.

| Time Limit(s) | Type of Loss, Cause of Loss and Coverage |
|---|---|
| 120 Days | **Newly Acquired Property** |
| 180 Days | **Extended Period of Liability -Gross Earnings and Rental Insurance** |
| 15 Hours | **Protection and Preservation of Property** After first taking reasonable action |
| 15 Days | **Impounded Water** After length of time required, with the exercise of due diligence and dispatch, to repair or replace damaged dam, reservoir, or equipment |
| 30 Days | **Ingress/Egress** from date of Occurrence |
| 30 Days | **Order of Civil or Military Authority** from date of Occurrence |

**Distance Limit(s):** No coverage for Time Element loss is provided if the location of the physical loss or damage is beyond the stated Distance Limits indicated below.

| Distance Limit(s) | Type of Loss, Cause of Loss and Coverage |
|---|---|
| 1 statute mile | From the Insured location for **Ingress/Egress** |
| 1 statute mile | From the Insured location for **Order of Civil or Military Authority** |

AIU AMALGAMATED Insurance Underwriters

**AOP Deductible(s): $25,000** per Occurrence, except: (AOP deductible buyback option available)

| Deductible | Type of Loss, Cause of Loss and Coverage |
|---|---|
| $250,000 per Occurrence | EARTH MOVEMENT except; |
| 2% of Applicable Values, minimum of $250,000 per Occurrence | EARTH MOVEMENT in the New Madrid Seismic Zone |
| $250,000 per Occurrence | FLOOD except; |
| High Hazard Flood Zone | $500,000 per Building per Occurrence for real property, $500,000 per Building per Occurrence for personal property, $100,000 per Occurrence for Time Element, or max flood amount available through NFIP whichever is greater |
| Moderate Hazard Flood Zone | $250,000 per Building per Occurrence for real property, $250,000 per Building per Occurrence for personal property, $100,000 per Occurrence for Time Element, or max flood amount available through NFIP whichever is greater |
| $250,000 per Occurrence | **Freeze Water Damage** |
| $25,000 per Occurrence | **Transportation** |
| $100,000 per Occurrence | NAMED WINDSTORM except: |
| 1% of Applicable Values, Minimum $100,000 per Occurrence per Location | NAMED WINDSTORM at locations in **Secondary Critical US Named Windstorm Areas** |
| 2% of Applicable Values, Minimum $100,000 per Occurrence per Location | **Wind/Hail** in the States of Alabama, Arkansas, Colorado, Kansas, Kentucky, Louisiana, Minnesota, Mississippi, Missouri, Nebraska, Oklahoma, and Texas |
| $250,000 per Occurrence | WILDFIRE for locations with a Core Logic score between 30 and 50** |
| $250,000 per Occurrence | WILDFIRE in Moderate and High Wildfire Score Areas (Core Logic score of 51 and above) |
| 48 consecutive hours | Waiting period from the inception of interruption of services for **Service Interruption – Property Damage and Service Interruption – Time Element** |

AIU AMALGAMATED Insurance Underwriters

## Chino Central Group, LLC

## Property Coverage (Blanket Coverage) : 06/01/2026 - 05/28/2027

| Property Description | Values | Deductibles | Valuation | Causes of Loss |
|---|---|---|---|---|
| Buildings | $26,572,455.00 | $25,000 per Occurrence unless otherwise noted. | Replacement Cost | Special Form |
| Business Income | $2,657,245.00 | | Actual Loss Sustained | |
| Business Personal Property | $0.00 | | | |
| **Total Insured Values:** | **$29,229,700.00** | | | |

## Specified Coverage(s):

| Coverage Type | Coverage Amount | Property Name | Property Address |
|---|---|---|---|
| Earth Movement | Excluded | Chino Central Group, LLC | 12125 Central Ave |

AIU AMALGAMATED Insurance Underwriters

## Covered Locations

(For locations with multiple addresses, see list of addresses on Appendix A attached to this document.)

| Name | Location | Units |
|---|---|---|
| Chino Central Group, LLC | 12125 Central Ave<br>Chino, CA 91710 | 16 |

AIU AMALGAMATED Insurance Underwriters

## Chino Central Group, LLC
## Property Premium Summary (inclusive of agency commission)

| Total Premium & Fees | Total Annual Premium | Total Short-Term Premium |
|---|---|---|
| Premium and Fees | $91,299.83 | **$90,346.76** |
| Taxes | $1,085.71 | **$1,073.81** |
| Premium Total Including Tax and Fees: | $92,385.54 | **$91,420.57** |

**We are now offering Premium Financing.**
Contact your underwriter if you desire a low rate finance quote.

**Minimum earned premium 25%. A portion of the short-term premium is 100% earned.**

| Inspection Charge | Annual Amount | Short-Term Amount |
|---|---|---|
| Amalgamated Loss Control Management, LLC | $600.00 | **$600.00** |

We, the aforementioned, do accept the proposal as presented and do hereby authorize Amalgamated Insurance Underwriters to bind in the Amalgamated Loss Control Management Program. We certify that we are aware of the program deductibles that will apply. We do understand that AIU cannot bind coverage without the consent of the Insurer. Coverage is not effective upon your order to bind, but upon confirmation to you that the Insurer has indeed bound that coverage.

**For properties located in Areas** with a Core Logic score of 30-49, **and Moderate or High Wildfire Score Areas** (Core Logic score of 50 and above): We understand that the Wildfire deductible is $250,000. (Except if a deductible buyback is purchased for locations which they are available to.)

**For CA, AK, HI, NV, Pacific Northwest Seismic Zone, and New Madrid Seismic Zone Risks only:** We understand that earthquake coverage is **Excluded**.

**For California Risks:**
Please note that this quote is subject to binding restrictions in the event of a wildfire. Please check with our office immediately prior to submitting your bind request to confirm clearance to place coverage.

**I am confirming that we are not aware of any unreported losses, or incidents that may give rise to claims in the future. I am confirming that I am aware of all coverages, deductibles, and limitations as notes above. I am confirming that the property and building is occupied, and if it is vacant no losses will be covered by this insurance policy.**
**Please bind coverage effective: 06/01/2026**

____________________________________________
Signature / Title / Date

**Quote is valid for 45 days from original quote date or when effective date passes** (whichever is first).

AIU AMALGAMATED Insurance Underwriters

## OPTIONAL Deductible Buyback Coverage

This portion of premium is 100% earned.

| DESCRIPTION OF COVERAGE | ANNUAL AMOUNT |
|---|---|
| AOP $10,000 Deductible Buyback Coverage<br>Applies only to AOP perils with standard deductibles | **$3,868.63** |

☐ I Accept Deductible Buyback ☐ I Reject Deductible Buyback

Signature / Title / Date

AMALGAMATED Insurance Underwriters

## Chino Central Group, LLC

1. This proposal is based upon exposures to loss identified by information that you provided regarding your business and operations. If there are other business exposures that need to be evaluated prior to binding coverage, please bring these to our attention.
2. Should any of your exposures change after coverage is bound, such as new operations, property purchases, hiring employees in additional states, etc., please let us know so proper coverage(s) can be discussed.
3. The coverage valuation provided were determined by you. We recommend a professional appraisal to ensure that such values and limits are adequate to protect your assets. Higher limits of liability may be available.
4. Estimated exposure basis (i.e. replacement cost, business personal property, and business income) were established by information you provided. If actual exposures for the policy term(s) are different than estimated, the final premium may be adjusted.
5. The entity(ies) designated as named insured is/are the only entity(ies) covered under this proposal. Please notify our office immediately if you should acquire or form any new organizations so we provide appropriate coverage.
6. The abbreviated outlines used throughout this proposal are not intended to express any legal opinion as to the nature of coverage. They are only intended as a brief summary of coverage. The insuring agreement, terms, and conditions of the actual policy form(s) purchased will govern the coverage being provided. Please read your policy for specific details.
7. As an independent insurance agency, we are compensated by insurance companies for marketing their products. Our agency's compensation might also include incentives in addition to standard commissions. This compensation is known as "Profit Sharing" and is paid year-end, based on a combination of business written, profitability and retention throughout the year. We do not know if this additional compensation will be received at the time an individual policy is written. Insurance companies are required to file these compensation arrangements with the appropriate insurance regulatory agency within each state of operation.
8. The insured understands that, to continue to qualify for this program, you must have a Loss Control Services Agreement in effect with Amalgamated Loss Control Management, LLC. All insurance coverage provided under this program will cease immediately upon termination of the management contract.
9. For renewal quotations: This quotation is valid until the inception date of the renewal term. Coverage expires on the expiration date of the current term unless we receive a written request to bind coverage before the expiration date.
10. The limit of liability shown herein or endorsed on this policy is the total of the insurer's limit of liability applicable to each occurrence in respect of all individual insureds combined. Notwithstanding any other terms and conditions of this policy to the contrary, in no event shall the liability of the Insurance Carrier(s) exceed this limit or amount irrespective of the number of locations or insureds involved.
11. This form is for illustration purposes only. Please read your policy for specific details.

AMALGAMATED Insurance Underwriters

**Appendix A**

## Itemized Addresses:

12125-12233 Central Ave Chino CA 91710

AIU AMALGAMATED Insurance Underwriters

## *U.S. NAMED WINDSTORM AREAS*

When a **Critical US Named Windstorm Areas** Deductible(s) applies under the Policy, **Critical US Named Windstorm Areas** shall mean Location(s) situated wholly or partially in:

**Alabama**
Counties of Baldwin, Mobile
**Florida**
Entire state
**Georgia**
Counties of Brantley, Bryan, Camden, Charlton, Chatham, Effingham, Glynn, Liberty, Long, McIntosh, Wayne
**Hawaii**
Entire state
**Louisiana**
Parishes of Acadia, Ascension, Assumption, Calcasieu, Cameron, Iberia, Jefferson, Jefferson Davis, Lafayette, Lafourche, Livingston, Orleans, Plaquemines, St. Bernard, St. Charles, St. Helena, St. James, St. John the Baptist, St. Martin, St. Mary, St. Tammany, Tangipahoa, Terrebonne, Vermilion, Washington
**Mississippi**
Counties of George, Hancock, Harrison, Jackson, Pearl River, Stone
**North Carolina**
Counties of Beaufort, Bertie, Bladen, Brunswick, Camden, Carteret, Chowan, Columbus, Craven, Currituck, Dare, Duplin, Gates, Greene, Hertford, Hyde, Jones, Lenoir, Martin, New Hanover, Onslow, Pamlico, Pasquotank, Pender, Perquimans, Pitt, Tyrrell, Washington
**South Carolina**
Counties of Beaufort, Berkeley, Charleston, Colleton, Dillon, Dorchester, Florence, Georgetown, Hampton, Horry, Jasper, Marion, Williamsburg
**Texas**
Counties of Aransas, Bee, Brazoria, Brooks, Calhoun, Cameron, Chambers, Fort Bend, Galveston, Goliad, Hardin, Harris, Hidalgo, Jackson, Jefferson, Jim Wells, Kennedy, Kleberg, Liberty, Live Oak, Matagorda, Nueces, Orange, Refugio, San Patricio, Victoria, Wharton, Willacy.
**Virginia**
Counties of Accomack, Charles City, Gloucester, Isle of Wright, James City, Lancaster, Mathews, Middlesex, New Kent, Northampton, Northumberland, Prince George, York and Independent cities: Chesapeake, Hampton, Newport News, Norfolk, Poquoson, Portsmouth, Suffolk, Virginia Beach, Williamsburg

## *U.S. NAMED WINDSTORM AREAS*

When a **Secondary Critical US Named Windstorm Areas** Deductible(s) applies under the Policy, **Secondary Critical US Named Windstorm Areas** shall mean Location(s) situated wholly or partially in:

**Connecticut**
Counties of Fairfield, Middlesex, New Haven, New London
**Delaware**
Counties of Kent, New Castle, Sussex
**Maryland**
Counties of Anne Arundel, Baltimore, Baltimore City, Calvert, Caroline, Cecil, Charles, Dorchester, Harford, Howard, Kent, Prince George's, Queen Anne's, Somerset, St. Mary's, Talbot, Wicomico, Worchester
**Massachusetts**
Counties of Barnstable, Bristol, Dukes, Nantucket, Plymouth
**New Jersey**
Counties of Atlantic, Bergen, Burlington, Cape May, Morris, Cumberland, Essex, Hudson, Middlesex, Monmouth, Ocean, Passaic, Salem, Somerset, Union
**New York**
Counties of Bronx, Kings, Nassau, New York, Queens, Richmond, Rockland, Suffolk, Westchester
**Rhode Island**
Counties of Bristol, Kent, Newport, Providence, Washington

## *PACIFIC NORTHWEST SEISMIC ZONE*

**Oregon**
Counties of Benton, Clackamas, Clatsop, Columbia, Coos, Curry, Douglas, Jackson, Josephine, Klamath, Lake, Lane, Lincoln, Linn, Marion, Multnomah, Polk, Tillamook, Washington, Yamhill

**Washington**
Counties of Chelan, Clallam, Clark, Cowlitz, Grays Harbor, Island, Jefferson, King, Kitsap, Kittitas, Lewis, Mason, Pacific, Pierce, San Juan, Skagit, Skamania, Snohomish, Thurston, Wahkiakum, Whatcom

AIU AMALGAMATED Insurance Underwriters

# AMALGAMATED LOSS CONTROL MANAGEMENT, LLC
## LOSS CONTROL SERVICES AGREEMENT

This Loss Control Services Agreement ("Agreement") is made and entered into as of this _day of _________, 20__ ("Effective Date") by and between _____________________, a___________, (hereinafter called the "Owner"), and Amalgamated Loss Control Management LLC, an Idaho limited liability company and all its affiliated companies, (hereinafter collectively called the "Service Agent").

RECITALS

WHEREAS, Owner is the owner of the Properties listed in Exhibit "A", attached hereto, and made a part hereof (the "Properties");

WHEREAS, Owner desires to employ Service Agent to advise on safety and risk exposures of said Properties, including Properties loss control surveys, and such engineering surveys and related support required, among other things, subject to the terms and conditions of this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. RECITALS: The above recitals are true and correct and are incorporated herein by reference.

2. SERVICES FEE: Owner authorizes and instructs Service Agent to provide the Services (hereinafter defined) for the Properties and shall compensate Service Agent in accordance with the rates set forth below (hereinafter called the "Services Fee"). Such compensation is due and payable upon delivery of written invoice to Owner.

Year 1: $600 per Property Location
Each Year Thereafter: $600 per Property Location

3. SCOPE OF SERVICES and SERVICE AGENT RESPONSIBILITIES: The duties and responsibilities of Service Agent in connection with the Properties are as follows (herein, collectively the "Services"):

AIU AMALGAMATED Insurance Underwriters

A. Loss Control Services

1. To supervise and implement loss control surveys, engineering surveying support, and to recommend corrective measures as needed for the Properties in order to achieve the most advantageous loss control and safety results.

2. Service Agent shall maintain and provide to Owner the data and analysis created and obtained in providing the Services.

3. As needed, to provide written notice of corrective action that is required for the Properties or any of them to remain insurable and eligible for inclusion under any insurance policy maintained or controlled by Service Agent.

4. The Services provided pursuant to this Paragraph 3(A) are intended to (i) promote safety awareness, (ii) assist in the identification of conditions which may pose a risk of bodily injury and/or property damage, and (iii) offer recommendations and /or suggestions to help mitigate Owner's risk of loss. Service Agent does not represent that the Services will identify every potential risk or hazard inherent in Owner's business activities or existing on Owner's Properties. Thus, Service Agent does not represent, guaranty, or promise that the Services will eliminate all risk of injury or property damage or result in improved loss experience.

5. In providing the Services, Service Agent shall act in an advisory and consultative capacity. Owner shall retain the right to determine whether to act on or implement the information, recommendations, and suggestions provided by Service Agent, and the manner by which any such action or implementation shall be undertaken.

6. It is understood and agreed that Service Agent is not providing any legal, tax or accounting service, advice or opinion and the Services shall not be interpreted as representing any such service, advice, or opinion. Owner shall consult its own attorney on all legal issues and its own tax and accounting experts on all tax, accounting and financial matters relating to its operations.

7. The Services provided to Owner are non-exclusive and Service Agent may provide the same or similar services to other clients who may be in the same industry, business, or service as Owner.

B. Additional Services

If requested by Owner, Service Agent shall coordinate the placement through a licensed insurance producer of the Properties under an insurance policy or policies issued by one or more insurance companies ("Insurers") where the Service Agent is the Primary Named Insured (hereinafter

collectively, the "Policy"). If insurance is obtained for Owner pursuant to this paragraph 3B. the parties acknowledge and agree that:

1. As primary Named Insured on the Policy, the Service Agent is not acting as an insurance company, insurance broker, insurance agent or insurance producer, and is otherwise not engaging in the transaction or the engagement of insurance business.

2. Service Agent shall secure such coverage through the addition of Owner to the Policy as an additional insured. Thereafter, Owner shall be responsible for complying with all terms, conditions, and obligations imposed by the Policy upon an insured.

3. In consideration of the additional services provided pursuant to this paragraph 3B (the "Additional Services"), Owner shall pay a fee, in an amount to be calculated and invoiced by Service Agent, reflecting Owner's premium charged for the Policy as well as Owner's contribution to fund retention amounts required under the Policy. The sums paid for the funding of such retention amounts (the "Retention Fees") shall be managed and held by Service Agent. In the event that there are Retention Fees which remain unused as of the expiration of the Policy, or as of the earlier termination of Owner's additional insured status thereunder, then Owner agrees that such amounts shall be retained by Service Agent as a management fee.

4. In the event of termination of this Agreement as set forth in Paragraph 4A and 4B below, Service Agent will no longer be obligated to secure or maintain additional insured status for Owner under the Policy. Service Agent, as primary Named Insured, shall be authorized and entitled to advise the Insurers, on behalf of Owner, of the cancellation of Owner's additional insured status.

5. If Owner chooses to retain a public adjuster to assist with the adjustment or evaluation of a claim under the Policy, Owner agrees that it will select a public adjuster that has been approved by Service Agent, whose approval will not be unreasonably withheld. and will not retain a public adjuster that has not been approved by Service Agent. Retention of an un-approved public adjuster with respect to a claim under the Policy may result in termination of this Agreement by Service Agent.

6. No claim may be submitted by Owner to Service Agent for submission to the Insurers' claims administrator on behalf of Owner unless such submission complies with the terms and conditions of the Policy.

7. Owner, to the fullest extent allowed under applicable law, waives any claim against Service Agent for any activities in connection with the foregoing and acknowledges that Service Agent is not acting as any type of regulated insurance entity that may be subject to certain restrictions on the foregoing activities.

8. In the event that any claim by Owner, which claim is tendered to Service Agent for submission to the Insurers' claims administrator pursuant to this Paragraph 3B, results in any action, causes of action, claims, proceedings or demands being brought against the Service

Agent, the Owner agrees to hold harmless, indemnify and defend Service Agent and its officers, directors and employees from and against any and all damages, losses, injuries, liabilities, or other payments (including but not limited to reasonable attorneys' fees and expenses) arising from any such action, claim or proceeding being commenced against Service Agent and/or damages being sought from Service Agent. Under no circumstances shall Service Agent be liable for any punitive damages, fines, penalties, taxes or any indirect, incidental, or consequential damages of any kind.

4. TERM:

A. The term of this Agreement shall commence on the Effective Date and shall continue thereafter until written termination by either party in accordance with this Agreement. Either party may elect to terminate this Agreement in its sole discretion for any or no reason upon not less than thirty (30) days written notice to the other. Upon termination, Service Agent shall deliver to Owner all papers, books, records, and materials maintained by Service Agent on behalf of the Owner in connection with the provision of the Services. The termination of this Agreement shall not affect the right of Service Agent to receive any outstanding Services Fee that has accrued as of the date specified in such termination notice or to be indemnified by Owner as per Paragraph 3B(6) hereof. This Paragraph 4 shall survive any termination of this Agreement.

B. Owner understands that any termination of this Agreement shall entitle Service Agent, on behalf of Owner, to effectuate the cancellation of Owner's additional insured status in accordance with paragraph 3B hereof. Service Agent shall be entitled to effectuate such cancellation without any separate notice to Owner by the Service Agent or its insurance carriers(other than notice of termination of this Agreement if given by Service Agent pursuant to Paragraph 4A above). Service Agent shall, within ninety (90) days following termination, coordinate any refund of the unearned premium from the insurer of the Properties that is due to the Owner as a result of the termination of Owner's additional insured status.

5. GOOD FAITH: Service Agent agrees to use commercially reasonable good faith efforts in providing the Services. Service Agent shall not be liable for any error of judgment or for any mistake of fact or law, or for anything which Service Agent may do or refrain from doing hereunder, except in cases of willful misconduct or gross negligence.

6. DOCUMENTATION: Upon request, Service Agent shall provide Owner with copies of all documents pertaining to the provision of the Services for the Properties, including copies of the Policy.

7. RELATION OF THE PARTIES: Service Agent is retained by the Owner only for the purpose and to the extent set forth in this Agreement and its relation to the Owner shall, during the term of this Agreement, and the provision of the Services hereunder, be that of an independent vendor/contractor, and Service Agent shall not be considered or deemed an employee, partner or otherwise with Owner.

8. ASSIGNMENT: This Agreement is not assignable by Owner. Service Agent may employ such parties as necessary to assist in the provision of the Services, at Service Agent's

AIU AMALGAMATED Insurance Underwriters

expense. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and assigns except as above limited.

9. NOTICES: All notices which are required or permitted hereunder must be in writing and shall be deemed to have been given, delivered or made, as the case may be, (notwithstanding lack of actual receipt by the addressee) (i) when delivered by personal delivery (with delivery confirmation proof) or (ii) three (3) business days after having been deposited in the United States mail, certified or registered, return receipt requested, sufficient postage affixed and prepaid, or (iii) one (1) business day after having been deposited with an expedited, overnight courier service (such as by way of example but not limitation, UPS or Federal Express), addressed to the party to whom notice is intended to be given at the address set forth below:

As to Owner:

__________________________________

__________________________________

Address:

__________________________________

__________________________________

As to Service Agent:

Ben Z. Goldberg
Amalgamated Loss Control Management
1 Paragon Drive Ste 200
Montvale, NJ 07645

10. COMPLETE AGREEMENT: This Agreement constitutes all of the understandings and agreements of whatever nature or kind existing between the parties with respect to the Service Agent's provision of the Services. Any change or modification must be evidenced by a written instrument executed by both parties. This Agreement shall be interpreted as if written jointly by the parties.

11. SEVERABILITY: Should any court of competent jurisdiction decide, hold, adjudge or decree that any provision, paragraph, clause or term of this Agreement is void or unenforceable in a particular situation, such determination shall not affect any other provision of the Agreement, and all other provisions of this Agreement shall remain in full force and effect.

12. LAWS: This Agreement shall be interpreted and construed under the laws of the state of Indiana.

13. LITIGATION FEES: Should any litigation be commenced between the Owner and the Service Agent concerning this Agreement or the rights and duties of either in relation thereto, the party prevailing in such litigation shall be entitled to a reasonable sum as and for attorney's fees, together with reasonable costs related thereto.

14. COUNTERPARTS: This Agreement may be executed in several counterparts, each of which shall be an original, but all of which shall constitute but one and the same Agreement.

15. STRICT PERFORMANCE: Failure of either party to insist upon the strict

AIU AMALGAMATED Insurance Underwriters

performance of any of the terms or provisions of this Agreement or to exercise any option, right, or remedy herein contained, shall not be construed as a waiver or as a relinquishment for the future of such term, provision, option, right or remedy, but the same shall continue and remain in full force and effect.

16. PROPRIETARY INTERESTS. Service Agent shall retain the copyright and the sole right of ownership to the form and format of any report, tool, schedule, exhibit, assessment, analysis, or other deliverable, that is created or developed by Service Agent in performing the Services and provided to Owner by Service Agent in any media whatever. Owner shall remain the owner of any Owner data or information that was provided to Service Agent for the performance of the Services. Any deliverable created by Service Agent for Owner shall be used for Owner's internal purposes and shall not be used, without the written consent of Service Agent, for Owner's commercial gain, nor shall it be distributed to or shared by Owner with any third person, except as may be necessary to accomplish the intent and purpose of this Agreement.

17. CONFIDENTIALITY. As a result of their relationship under this Agreement, each party may gain access to confidential information concerning the other. For purposes of this Agreement, the term "Confidential Information" includes, without limitation (i) any information or data about a party's business operations, clients, employees, marketing plans, method of operation, trade secrets, and financial performance; (ii) information about either party's employees and (iii) any other information about a party that is not available to the general public. Neither party shall, without the written consent of the other, release, disclose or disseminate the other party's Confidential Information except as is necessary for the performance of the Services.

In the event that either party becomes the subject of a subpoena or court order compelling the disclosure of the other party's Confidential Information, that party whose Confidential Information is being sought can take such action as may be necessary to prevent or limit the release of its Confidential Information.

Neither party shall be deemed to be in breach of this Paragraph 17 if it has notified the other before it releases the Confidential Information pursuant to a subpoena or court order, and the party whose Confidential Information was requested fails to provide, before the deadline for disclosure, a copy of a court order quashing the subpoena or otherwise limiting the demand for Confidential Information.

18. FORCE MAJEURE. Neither party shall be liable or deemed to be in default for any delay or failure in performance under this Agreement resulting, directly or indirectly from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, power outages, failure of computer systems, machinery or supplies, vandalism, strikes, or other work interruptions, pandemics, epidemics or any similar or other cause that is beyond the reasonable control of either party. Each party shall make a good faith effort to perform under this Agreement in the event of any such circumstances and shall resume full performance of its contract duties as soon as reasonably practicable.

AIU AMALGAMATED Insurance Underwriters

IN WITNESS WHEREOF, the parties have executed this Agreement upon this the ____ day of _______, 20__.

Owner: _____________________________________.

Service Agent: _______________________________.

Exhibit "A"
All Locations; as listed on signed SOV attached to Owner file.

# IMPORTANT NOTICE:

**1. The insurance policy that you are applying to purchase is being issued by an insurer that is not licensed by the State of California. These companies are called "nonadmitted" or "surplus line" insurers.**

**2. The insurer is not subject to the financial solvency regulation and enforcement that apply to California licensed insurers.**

**3. The insurer does not participate in any of the insurance guarantee funds created by California law. Therefore, these funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised.**

**4. The insurer should be licensed either as a foreign insurer in another state in the United States or as a non-United States (alien) insurer. You should ask questions of your insurance agent, broker, or "surplus line" broker or contact the California Department of Insurance at the toll-free number 1-800-927-4357 or internet website www.insurance.ca.gov. Ask whether or not the insurer is licensed as a foreign or non-United States (alien) insurer and for additional information about the insurer. You may also visit the NAIC's internet website at www.naic.org. The NAIC—the National Association of Insurance Commissioners—is the regulatory support organization created and governed by the chief insurance regulators in the United States.**

**5. Foreign insurers should be licensed by a state in the United States and you may contact that state's department of insurance to obtain more information about that insurer. You can find a link to each state from this NAIC internet website: https://naic.org/state_web_map.htm.**

**6. For non-United States (alien) insurers, the insurer should be licensed by a country outside of the United States and should be on the NAIC's International Insurers Department (IID) listing of approved nonadmitted non-United States insurers. Ask your agent, broker, or "surplus line" broker to obtain more information about that insurer.**

**7. California maintains a "List of Approved Surplus Line Insurers (LASLI)." Ask your agent or broker if the insurer is on that list, or view that list at the internet website of the California Department of Insurance: www.insurance.ca.gov/01-consumers/120-company/07-lasli/lasli.cfm.**

**8. If you, as the applicant, required that the insurance policy you have purchased be effective immediately, either because existing coverage was going to lapse within two business days or because you were required to have coverage within two business days, and you did not receive this disclosure form and a request for your signature until after coverage became effective, you have the right to cancel this policy within five days of receiving this disclosure. If you cancel coverage, the premium will be prorated and any broker's fee charged for this insurance will be returned to you.**

**Date: ____________________________**

**Insured: _________________________**

**D-1 (Effective January 1, 2020)**

# INSTRUCTIONS

**SECTION 1:** Please provide the full name, as it is written on the individual's California license, of the individual who performed or supervised the diligent search. If the search was performed under the individual's license number, enter the individual's California license number in section (A) or if the individual was authorized as an endorsee under an organizational license, enter the name of the organization and its California license number in section (B).

**SECTION 3:** Please provide a complete response to section (A), and if applicable to section (B). Note: The Insurance Commissioner or his designee may require the surplus line broker to conduct additional searches among admitted insurers for similar placements in the future. (California Insurance Code section 1763[b]) An incomplete response will be tagged and may unnecessarily result in a request for a further search to be conducted.

- **SECTION 3(A):** To avoid misidentification among insurers with similar names, please provide the complete name of the admitted insurer as listed in the California Department of Insurance (CDI) Official Publication of Admitted Companies and the insurance company's National Association of Insurance Commissioners (NAIC) number. Please include Insurer contact name and telephone number or email address, or if a website based quoting platform was used, enter the website name.

  Please refer to the California Department of Insurance Official Publication of Admitted Companies.
  https://interactive.web.insurance.ca.gov/apex_extprd/f?p=144:1

- **SECTION 3(B):** The detailed explanation in section 3(B) must include a description of the steps the broker took to determine whether three insurers write the type of insurance or risk and the reasoning for the determination. A conclusory statement is insufficient.

**SIGNATURE:** The Surplus Line Association of California (SLA) will accept a wet signature or a digital and electronic signature from the California Secretary of State's Approved List of Digital Signature Certification Authorities. Please refer to the following link:

https://www.sos.ca.gov/administration/regulations/current-regulations/technology/digital-signatures/approved-certification-authorities/

**IMPORTANT:** Persons who are licensed only as an agent are authorized to offer risks only to admitted insurers for which they are appointed agents (California Insurance Code section 1704). Agents are not authorized to offer a risk to admitted insurers for which they are not appointed agents. A search which is limited to only those companies that have appointed the agent may not necessarily constitute a diligent search of the admitted market.

**WHAT TO FILE:** This report must be filed along with the Confidential Report of Surplus Line Placement. (SL-1 Form). File this Form with signature, and, only if applicable, the Addendum.

**WHERE TO FILE:** The SL-1 Form and this report are to be filed by the surplus line broker with SLA within 60 days of placement of coverage with non-admitted insurer(s).

**MULTIPLE LICENSEES CONDUCTING SEARCH:** If two or more licensees conduct a diligent search of admitted insurers, then each licensee must complete a Diligent Search Report (SL-2 Form). All such reports should be attached to the SL-1 Form.

Please refer to the **Coverage Code List** and **Export Code List** under Resources on the Learning Center for the full list of coverages and their respective codes.

https://learningcenter.slacal.com/resources/filing-requirements-and-procedures/coverage-codes
https://learningcenter.slacal.com/resources/filing-requirements-and-procedures/export-list-codes

The Surplus Line Association of California

# DILIGENT SEARCH REPORT (SL-2 FORM)

①

Before completing this report, please review the instructions on page 2.

I, ______________________________________, hereby submit that I performed or supervised this diligent search, and I am:

***(A)*** licensed as an individual agent-broker for the applicable lines of insurance or surplus line broker under California license number _______________; **OR**

***(B)*** licensed and an endorsee on the license of ________________________________________ (**Full Name of Organization**), California license number ________________________________

②

***(A)*** Name of Insured: Chino Central Group LLC

***(B)*** Description of Risk: ________________________________
(e.g., Tattoo Parlor, Cannabis Dispensary, Vacant Building, **NOT TYPE OF COVERAGE**)

***(C)*** Type of Insurance or Coverage Code: ________________________________

③

Describe the diligent efforts made to place this coverage with admitted insurers by completing (A) or, if applicable, (B) below.

***(A)*** List the insurers admitted in California who actually write the type of insurance described on lines 2(B) and 2(C) to which you or someone under your supervision submitted the risk described in lines 2(A) through 2(C). Please complete **ALL** sections of the table below.

| | INSURER ① | INSURER ② | INSURER ③ |
|---|---|---|---|
| **NAIC ID** | | | |
| **MONTH, YEAR OF DECLINATION** | | | |
| **FULL NAME OF ADMITTED INSURER** | | | |
| CONTACT INFORMATION **FULL NAME** | | | |
| **PHONE / EMAIL** | | | |
| ***OR* WEBSITE** | | | |

***(B)*** If you did not list at least three insurers in 3(A) above, describe in detail how you determined that fewer than **THREE** admitted insurers write the type of insurance described on lines 2(B) and 2(C). ________________________________

④

Is the type of insurance you are reporting as identified in line 2(C) **private passenger automobile liability or health**? Yes ☐ No ☐

If you answered "yes," please complete the Diligent Search Report Addendum.

The undersigned licensee hereby certifies that this report is true and correct, and that this risk is not being placed with a non-admitted insurer for the sole purpose of securing a rate or premium lower than the lowest rate or premium available from an admitted insurer.

________________________________ (Signature of Licensee Named on Line 1)

________________________________ (Date)

## DILIGENT SEARCH REPORT (SL-2 FORM) ADDENDUM

## PRIVATE PASSENGER AUTOMOBILE LIABILITY INSURANCE COVERAGE OR HEALTH INSURANCE COVERAGE

1. If **Private Passenger Automobile Liability Insurance** is identified on line 2(C), complete the following:

   (A) Does the insured qualify as a "Good Driver" under Section 1861.025 of the California Insurance Code?
   https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=INS&sectionNum=1861.025.

   **(CHECK ONE) YES ☐ NO ☐**

   (B) Does the coverage that you have placed include, in whole or in part, the limits of coverage provided under the California Automobile Assigned Risk Plan (CAARP)?

   **(CHECK ONE) YES ☐ NO ☐**

   If YES, has this risk been submitted to and found to be ineligible by CAARP?

   **(CHECK ONE) YES ☐ NO ☐**

   If your answer is NO, this coverage cannot be placed with a non-admitted insurer.
   (See California Insurance Code section 1763.5)
   https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=INS&sectionNum=1763.5.

2. If **Health Insurance** is identified on line 2(C), does the insured qualify as a "Small Employer" under

   California Insurance Code section 10700(x)?
   https://leginfo.legislature.ca.gov/faces/codes_displayText.xhtml?lawCode=INS&division=2.&title=&part=2.&chapter=8.&article=1.

   **(CHECK ONE) YES ☐ NO ☐**

# EXHIBIT 3

STETSON
INSURANCE FUNDING

We are pleased to introduce you to Stetson Insurance Funding, LLC ("Stetson") an affiliate of Ryan Specialty that facilitates its premium finance requests.

Stetson has teamed up with FIRST Insurance Funding ("FIRST"), one of the largest premium finance companies in North America. Under this collaboration*, FIRST is the lender, as listed on the Premium Finance Agreement, and the loan will be serviced by FIRST.

Stetson will be your Agency's primary point of contact throughout the life of the loan and provide ongoing support to your Agency.

## GUIDELINES TO OBTAIN FINANCING WITH STETSON:

1. **Request changes and provide updates to the premium finance agreement by:**
   - Visiting our website at www.stetsonfunding.com
   - Emailing us at quotes@stetsonfunding.com
   - Calling us at 1-866-856-1112
2. **Loan Down Payment:**
   - **Commercial Lines** – Your Agency collects the down payment from the Insured and sends it to the General Agent or Carrier.
   - **Personal Lines** – The Insured can pay the down payment to your Agency or to FIRST via electronic check by calling 1-800-837-2513; please reference the quote number on the attached Premium Finance Agreement.
3. **Return the signed Premium Finance Agreement, along with the ACH Authorization for Direct Debit, if applicable, to agreements@stetsonfunding.com**
   - FOR PERSONAL LINES ONLY: Stetson must also receive the Truth-In-Lending Disclosures page. If multiple borrowers are listed on the Premium Finance Agreement, eachborrower must sign the Premium Finance Agreement and initial the Truth-In-Lending Disclosures page.
4. **Stetson coordinates with FIRST to finalize the loan and fund accordingly. Note that all loan installment payments are due to FIRST.**

**Thank you for your business.**
**We look forward to exceeding your premium finance expectations!**

**This information does not apply to premium finance requests submitted directly to FIRST.*

**LENDER:**
FIRST Insurance Funding
450 Skokie Blvd, Ste 1000
Northbrook, IL, 60062-7917
P:(800) 837-3707, F:(800) 837-3709

# PREMIUM FINANCE AGREEMENT

☐ Personal ☑ Commercial ☐ Additional Premium

Stetson Insurance Funding, LLC
10150 York Road, Fifth Floor
Hunt Valley, MD, 21030
P: (866) 373-3866

STETSON INSURANCE FUNDING

**Quote #: 98412166**

| INSURED/BORROWER Customer ID: N/A | AGENT or BROKER AGT43542 |
|---|---|
| (Name and Address as shown on Policy)<br>CHINO CENTRAL GROUP LLC (DIP)<br>520 Newport Center Dr<br>Ste 480<br>Newport Beach, CA 92660-7034 | (Name and Business Address)<br>Trustee Insurance Agency<br>PO Box 190<br>Vicksburg, MI 49097 |

## LOAN DISCLOSURE

| Total Premiums, Taxes, and Fees | Down Payment | Unpaid Balance | Documentary Stamp Tax (only applicable in Florida) | Amount Financed (amount of credit provided on your behalf) | FINANCE CHARGE (dollar amount the credit will cost you) | Total of Payments (amount paid after making all scheduled payments) | ANNUAL PERCENTAGE RATE (cost of credit as a yearly rate) |
|---|---|---|---|---|---|---|---|
| 134,163.82 | 36,791.31 | 97,372.51 | 0.00 | 97,372.51 | 5,767.85 | 103,140.36 | 14.000 % |

***YOUR PAYMENT SCHEDULE WILL BE:*** ***Mail Payments to: FIRST Insurance Funding, PO Box 7000, Carol Stream, IL 60197-7000***

| Number of Payments | Amount of Each Payment | **First Installment Due** | 7/1/2026 |
|---|---|---|---|
| 9 | 11,460.04 | **Installment Due Dates** | 1st (Monthly) |

Certain information contained in the Loan Disclosure section may change in accordance with Section 19 of this Agreement.

**INSURED'S AGREEMENT:**

**1. SECURITY INTEREST.** INSURED/BORROWER ("Insured") grants and assigns FIRST Insurance Funding, A Division of Lake Forest Bank & Trust Company, N.A. ("LENDER") a first priority lien on and security interest in the financed policies and any additional premium required under the financed policies listed in the Schedule of Policies, including (a) all returned or unearned premiums, (b) all additional cash contributions or collateral amounts assessed by the insurance companies in relation to the financed policies and financed by LENDER hereunder, (c) any credits generated by the financed policies, (d) dividend payments, and (e) loss payments which reduce unearned premiums (collectively, the "Financed Policies"). If any circumstances exist in which premiums related to any Financed Policy could become fully earned in the event of loss, LENDER shall be named a loss-payee with respect to such policy.

**2. FINANCE CHARGE.** The finance charge begins accruing on the earliest effective date of the Financed Polices. The finance charge is computed using a 365-day calendar year.

**3. LATE PAYMENT.** For commercial loans, a late charge will be assessed on any installment at least 5 days in default, and the late charge will equal 5% of the delinquent installment or the maximum late charge permitted by law, whichever is less. For personal loans, a late charge will be assessed on any installment 10 days in default, and the late charge will be the lesser of $10 or 5% of the delinquent installment.

**4. PREPAYMENT.** If Insured prepays the loan in full, Insured is entitled to a refund of the unearned finance charge computed according to the Rule of 78s.

**SCHEDULE OF POLICIES**

| Policy Number | Full Name of Insurance Company and Name of General Agent or Company Office to Which Premium is Paid | Coverage | Policy Term | Effective Date | Premiums, Taxes and Fees |
|---|---|---|---|---|---|
| TBD | C00060-StarStone National Insurance Company<br>G03719-RT Chicago<br>[ME:25.000 %, CX:0] [PR] A/F [7,680.75] | EXLB | 12 | 6/1/2026<br>ERN TXS/FEES<br>FIN TXS/FEES | 9,241.00<br>0.00<br>1,000.00 |
| TBD | C00089-SCOTTSDALE INSURANCE COMPANY<br>G03719-RT Chicago<br>[ME:25.000 %, CX:0] [PR] A/F [4,449.64] | EXLB | 12 | 6/1/2026<br>ERN TXS/FEES<br>FIN TXS/FEES | 5,750.00<br>1,000.00<br>182.85 |
| (Policies continued on next page.) | | | | TOTAL | 134,163.82 |

Q# 98412166, PRN: 062326, CFG: Stetson-Default, RT: STETSON - AGENT - 7, DD: N/A, BM: Invoice, Qtd For: A36441 Original, Memo 2

**5. PROMISE TO PAY.** In consideration of the premium payment by LENDER to the insurance companies listed in the Schedule of Policies (or their authorized representative) or the Agent or Broker listed above, Insured unconditionally promises to pay LENDER, the Amount Financed plus interest and other charges permitted under this Agreement, including the Down Payment if owed and payable directly to LENDER, subject to all the provisions of this Agreement.

**6. POWER OF ATTORNEY.** INSURED IRREVOCABLY APPOINTS LENDER AS ITS "ATTORNEY-IN-FACT" with full power of substitution and full authority, in the event of default under this Agreement, to (a) cancel the Financed Policies in accordance with the provisions contained herein, (b) receive all sums assigned to LENDER, and (c) execute and deliver on behalf of Insured all documents relating to the Financed Policies in furtherance of this Agreement. This right to cancel will terminate only after all of Insured's indebtedness under this Agreement is paid in full. Insured is responsible for repayment of the Amount Financed plus interest and other charges permitted under this Agreement, including the Down Payment if owed and payable directly to LENDER, irrespective of whether LENDER exercises this right to cancel the Financed Policies.

**7. SIGNATURE & ACKNOWLEDGEMENT.** Insured has received, reviewed, and signed a copy of this Agreement. By signing below, you certify that you have the requisite authority to (a) enter into this Agreement on behalf of Insured (if applicable, including as agent, trustee, executor, or otherwise in a representative capacity) and any other insureds named on the Financed Policies, and (b) jointly and severally agree on behalf of all insureds named on the Financed Policies to all provisions set forth in this Agreement. **Insured acknowledges and understands that entry into this financing arrangement is not required as a condition for obtaining insurance coverage.**

**NOTICE TO INSURED: (1) Do not sign this Agreement before you read both pages of it, or if it contains any blank space. (2) You are entitled to a completely filled-in copy of this Agreement. (3) You have the right to prepay the loan in full and receive a refund of any unearned finance charge. (4) Keep a copy of this Agreement to protect your legal rights. (5) See last page of Agreement for your consent to electronic statement and notice delivery.**

Signature of Insured or Authorized Agent ____ Date ____ Signature of Agent ____ Date ____



FIF1122NBP

**ADDITIONAL PROVISIONS OF PREMIUM FINANCE AGREEMENT**

**8. APPLICATION OF PAYMENTS.** (a) Payments received by LENDER from Insured shall be applied first to installments, then to any unpaid fees. The payment of installments is prioritized over the payment of fees, which means when LENDER receives partial payments or overpayments of any installment(s), amounts previously applied to fees may be reallocated to enable a full installment(s) to be paid. This payment application method may cause fees to reappear as unpaid and owing after the payment period in which the fees were originally assessed and paid, but does not increase or otherwise change the amount of fees that Insured may be required to pay under this Agreement. (b) Any returned premium received by LENDER from the Financed Policies will be applied to reduce the total unpaid balance under this Agreement, which shall not relieve Insured of its obligation to pay any remaining installments due but may reduce the amount of such installments.

**9. EFFECTIVE DATE.** This Agreement will not become effective until it is accepted in writing by LENDER. LENDER will send a Notice of Acceptance to Insured to confirm this Agreement is effective.

**10. DEFAULT/CANCELLATION.** Insured is in default under this Agreement if (a) the Down Payment, if to be collected by LENDER, or any payment is not received by LENDER when it is due, (b) a proceeding in bankruptcy, receivership, insolvency or similar proceeding is instituted by or against Insured, or (c) Insured fails to comply with any of the terms of this Agreement. If Insured is in default, LENDER has no further obligation under this Agreement to pay premiums on Insured's behalf, and LENDER may pursue any of the remedies provided in this Agreement or by law. If a default by Insured results in a cancellation of the Financed Policies, Insured agrees to pay a cancellation charge for commercial loans, which will be the maximum permitted by law. No cancellation charge shall apply to personal loans. If cancellation or default occurs, Insured agrees to pay interest on the unpaid balance due at the contract rate until the balance is paid in full.

**11. LIMITATION OF LIABILITY. Insured understands and agrees that LENDER or its assignee is not liable for any losses or damages to Insured or any person or entity upon the exercise of LENDER's right of cancellation, except in the event of willful or intentional misconduct by LENDER.**

**12. INSUFFICIENT FUNDS CHARGE.** If Insured's payment is dishonored for any reason and if permitted by law, Insured will pay LENDER an insufficient funds charge equal to the maximum fee permitted by law for commercial loans and $10 for personal loans.

**13. LENDER'S RIGHTS AFTER THE POLICIES ARE CANCELLED.** After any Financed Policy is cancelled by any party or if a credit is otherwise generated, LENDER has the right to receive all unearned premiums and other funds assigned to LENDER as security herein and to apply them to Insured's unpaid balance under this Agreement or any other agreement between Insured and LENDER. Receipt of unearned premiums does not constitute payment of installments to LENDER, in full or in part. Any amounts received by LENDER after cancellation of the Financed Policies will be credited to the balance due with any excess paid to the Insured; the minimum refund is $1.00. Any deficiency shall be immediately paid by Insured to LENDER. Insured agrees that insurance companies may rely exclusively on LENDER's representations about the Financed Policies.

**14. ASSIGNMENT.** Insured may not assign any Financed Policy or this Agreement without LENDER's prior written consent. LENDER may transfer its rights under this Agreement without the consent of Insured.

**15. AGENT OR BROKER.** Insured agrees that the Agent or Broker issuing the Financed Policies or through whom the Financed Policies were issued is not the agent of LENDER, except for any action taken on behalf of LENDER with the express authority of LENDER, and LENDER is not bound by anything the Agent or Broker represents to Insured, orally or in writing, that is not contained in this Agreement. The Agent or Broker will receive from LENDER 0.86 % of the Amount Financed stated on page 1 for aiding in the administration of this Agreement relating to the Financed Policies. In NY, the Agent or Broker may assess a fee to Insured for obtaining and servicing the Financed Policies pursuant to NY CLS Ins § 2119. Any questions regarding this payment should be directed to the Agent or Broker.

**16. COLLECTION COSTS.** Insured agrees to pay reasonable attorney fees, court costs, and other collection costs to LENDER to the extent permitted by law if this Agreement is referred to an attorney or collection agent who is not a salaried employee of LENDER to collect money that Insured owes.

**17. GOVERNING LAW.** The loan terms subject to this Agreement are governed by applicable federal law and Illinois law (to the extent not preempted by federal law), without regard to principles of conflicts of law or choice of law. If any court finds any term herein to be invalid, such finding will not affect the remaining provisions.

**18. WARRANTY OF ACCURACY.** Insured represents and warrants that to the best of its knowledge: (a) the Financed Policies are in full force and effect and that the Insured has not and will not assign any interest in the Financed Policies except for the interest of mortgagees and loss payees, (b) the Down Payment and any past due payments have been paid in full to the Agent or Broker or Lender in cash or other immediately available funds, (c) all information provided herein or in connection with the Agreement is true, correct, and not misleading, (d) Insured is not insolvent nor presently involved in any insolvency proceeding, (e) Insured has no indebtedness to the insurance companies issuing the Financed Policies, (f) there is no provision in the Financed Policies that would require LENDER to notify or obtain consent from any other party to effect cancellation of the Financed Policies, and (g) Insured has disclosed if he or she is a covered member of the armed forces or a dependent of a covered member as defined in the Military Lending Act.

**19. ADDITIONAL PREMIUMS.** (a) Insured expressly agrees to (i) fully and timely comply with all audits by the insurance companies issuing the Financed Policies, (ii) timely provide complete and accurate payroll information, if applicable, and (iii) pay to the insurance companies any additional amount due in connection with the Financed Policies. The Amount Financed shall be applied to the Financed Policies' premium amounts and Insured shall be responsible for any additional premiums or other sums. (b) Insured, or Agent or Broker, may request that LENDER finance additional policies and/or additional premiums (the "Additional Premiums") for Insured during the term of this Agreement. If LENDER agrees, LENDER will send a Notice of Acceptance to Insured to confirm its approval to finance the Additional Premiums. For commercial loans, this Agreement shall be deemed amended on the date of the Notice of Acceptance to consolidate the Additional Premiums with Financed Policies into a single and indivisible loan transaction subject to this Agreement (with applicable changes to the payment schedule), and the Additional Premiums shall be "Financed Policies" on the date of the Notice of Acceptance. For personal loans, LENDER (or Agent or Broker on LENDER's behalf) will provide a separate Premium Finance Agreement to Insured for any Additional Premiums.

**20. CORRECTIONS.** LENDER may insert the names of insurance companies or policy numbers in the Schedule of Policies, if this information is not known at the time Insured signs this Agreement. LENDER is authorized to correct patent errors or omissions in this Agreement.

**21. NON-WAIVER.** Not Applicable.

**AGENT OR BROKER REPRESENTATIONS AND WARRANTIES**

Unless previously disclosed in writing to LENDER or specified in the Schedule of Policies, the Agent or Broker executing this Agreement expressly represents, warrants, and agrees as follows: (1) Insured has received a copy of this Agreement and has authorized this transaction, the signer of this Agreement (whether Insured or its agent) has valid authority to bind Insured and any other insureds named under the Financed Policies to the terms of this Agreement, including the Power of Attorney provision, Insured's signature is genuine, and the Down Payment has been received from Insured (unless the Down Payment was made to Lender), (2) the information contained in the Schedule of Policies including the premium amount is correct and accurately reflects the necessary coverage, (3) the Financed Policies (a) are in full force and effect, (b) are cancellable by Insured or LENDER (or its successors or assigns), (c) will generate unearned premiums which will be computed on the standard short rate or pro rata basis, and (d) do not contain any provisions which affect the standard short rate or pro rata premium computation, including but not limited to direct company bill, audit, reporting form, retrospective rating, or minimum or fully earned premium, (4) the Agent or Broker is either the insurer's authorized policy issuing agent or the broker placing the coverage directly with the insurer, except where the name of the Issuing Agent or General Agent is listed in the Schedule of Policies, (5) to the best of the Agent or Broker's knowledge, there are no bankruptcy, receivership, or insolvency proceedings affecting Insured, (6) Agent or Broker will hold harmless and indemnify LENDER and its successors and assigns against any loss or expense (including attorney's fees, court costs, and other costs) incurred by LENDER and resulting from Agent or Broker's violations of these Representations and Warranties or from Agent or Broker's errors, omissions, or inaccuracies in preparing this Agreement, and will promptly reimburse LENDER for any loss or expense incurred in connection with any incidence of fraud or lack of valid authority on behalf of Insured or any other named insureds with respect to the terms of this transaction, the Agreement, or the Financed Policies, (7) Agent or Broker will (a) hold in trust for LENDER any payments made or credited to Insured through or to Agent or Broker by the insurance companies or LENDER, and (b) pay these monies and the unearned commissions to LENDER upon demand to satisfy the outstanding indebtedness under this Agreement, and (8) to fully and timely assist with all payroll audits.

SCHEDULE OF POLICIES

Insured: CHINO CENTRAL GROUI
Quote #: 98412166

| Policy Number | Full Name of Insurance Company and Name of General Agent or Company Office to Which Premium is Paid | Coverage | Policy Term | Effective Date | Premiums, Taxes and Fees |
|---|---|---|---|---|---|
| TBD | C00208-MAXUM INDEMNITY COMPANY<br>G03719-RT Chicago<br>[ME:25.000 %, CX:0] [PR] A/F [15,287.36] | GL | 12 | 6/1/2026<br>ERN TXS/FEES<br>FIN TXS/FEES | 19,750.00<br>660.00<br>633.14 |
| TBD | C00005-LLOYDS OF LONDON<br>G03719-RT Chicago<br>[ME:25.000 %, CX:0] [PR] A/F [69,954.76] | PROP | 12 | 6/1/2026<br>ERN TXS/FEES<br>FIN TXS/FEES | 90,346.76<br>2,673.81<br>2,926.26 |

FIRST INSURANCE FUNDING

A WINTRUST COMPANY

450 Skokie Blvd, Ste 1000
Northbrook, IL 60062-7917
Phone: (800) 837-3707 Fax: (800) 837-3709

## FIRST Insurance Funding Agreement: ACH Authorization for Direct Debit

This Agreement governs ACH transactions initiated by FIRST Insurance Funding, A Division of Lake Forest Bank & Trust Company, N.A. ("FIRST") to credit or charge the Company indicated below. Both parties agree to be bound by NACHA Operating Rules as they pertain to all ACH transactions initiated by FIRST that credit or debit the Company's bank account listed below, and acknowledge that the origination of ACH transactions to the listed account must comply with provisions of U.S. law.

This Agreement provides authorization for recurring ACH Debit transactions to be initiated by FIRST. This Agreement will remain in effect until Company cancels it in writing. Both parties agree that this Agreement constitutes authorization to debit Company's bank account, and Company agrees not to dispute any debits with its bank provided the transaction(s) correspond to the terms indicated in this Agreement and any respective premium finance agreement(s) ("PFA(s)").

**Customer Information:**

Quote #: 98412166
FIRST Account #:
Company Name: CHINO CENTRAL GROUP LLC (DIP)
Street Address: 520 Newport Center Dr
City, State, Zip Code: Newport Beach, California 92660-7034
Contact:
Phone Number:
Email Address:

**Bank Information:**

Name on Bank Account: ______________________
Bank Name: ______________________
Bank Account #: ______________________
Bank Routing #: ______________________
Bank City/State: ______________________
Account Type: ______________________ (Checking or Savings)

**I Authorize FIRST to initiate ACH Debits and Credits to the bank account indicated above, provided each transaction is initiated according to the terms of this Agreement or any other PFA(s) I may have with FIRST to debit the amount(s) currently due, including any late fees, other charges, or payment shortages.**

SIGNATURE ______________________ DATE ______________________
NAME ______________________ TITLE ______________________

I certify that I am an authorized representative of the Company indicated above and that I have the authority to enter into this Agreement on the Company's behalf. Company understands that this authorization will remain in effect until it is canceled in writing, and agrees to notify FIRST in writing at least 15 days in advance of any changes in its account information or termination of this authorization. Company understands that this authorization applies to the FIRST Account # listed above and subsequent FIRST Account #s. Company understands that because these are electronic transactions, it will have limited time to report and dispute errors. In the case of an ACH Transaction being rejected for Non Sufficient Funds (NSF) Company understands that FIRST may at its discretion attempt to process the charge again within 30 days, and agrees to an additional NSF charge, as allowed by applicable law, for each attempt returned NSF. Company has certified that the above business bank account is enabled for ACH transactions, and agrees to reimburse FIRST for all penalties and fees incurred as a result of Company's bank rejecting ACH debits or credits as a result of the account not being properly configured for ACH transactions. Company acknowledges that the origination of ACH transactions to its account must comply with the provisions of U.S. law.

PLEASE FAX THIS FORM TO (847) 509-7105 OR EMAIL TO CONTROLLER@FIRSTINSURANCEFUNDING.COM

ACHDEBIT0418

# EXHIBIT 4

**RAINES FELDMAN LITTRELL LLP**
Kyra E. Andrassy (State Bar No. 207959)
*kandrassy@raineslaw.com*
Robert S. Marticello (State Bar No. 244256)
*rmarticello@raineslaw.com*
Stephen M. Mott (State Bar No. 362642)
*smott@raineslaw.com*
4675 MacArthur Court, Suite 1550
Newport Beach, CA 92660
Telephone: (310) 440-4100
Facsimile: (310) 691-1943

[Proposed] Counsel for Debtor
Chino Central Group, LLC

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT – SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>CHINO CENTRAL GROUP, LLC,<br><br>Debtor. | Case No.: 8:26-bk-10925-SC<br><br>Chapter: 11<br><br>**[PROPOSED] ORDER GRANTING MOTION PURSUANT TO 11 U.S.C. § 364(b) TO ENTER INTO PREMIUM FINANCE AGREEMENT WITH FIRST INSURANCE FUNDING, A DIVISION OF LAKE FOREST BANK & TRUST COMPANY, N.A.**<br><br>Hearing Information:<br>Date: TBD<br>Time: TBD<br>Ctrm: 5C |

At the above date and time, the Court held a hearing on the *Motion Pursuant to 11 U.S.C. § 364(b) to Enter Into Premium Finance Agreement with First Insurance Funding, a Division of Lake Forest Bank & Trust Company, N.A.* filed by Chino Central Group, LLC, the debtor in possession (the "Debtor") in this case. For the reasons set forth in the Motion and on the record,

**IT IS ORDERED AS FOLLOWS:**

1. The Motion is granted;

2. Pursuant to Section 364(c)(2) of the Code, the Debtor is authorized to enter into the Finance Agreement, in the form attached to the Motion as Exhibit 3, and the terms of the Finance Agreement are approved. The Debtor is authorized and directed to timely make all payments under the Finance Agreement, and FIRST is authorized to receive and apply such payments to the Indebtedness as provided in the Finance Agreement;

3. FIRST (or its successor or assigns) is granted a first-priority lien and security interest in the Finance Agreement Collateral and any additional premium required thereunder, including all returned premiums and unearned premiums and all other collateral define in the Finance Agreement. Without limitation, FIRST's liens, security interests and rights relating to the Finance Agreement Collateral granted: (i) are senior to (a) the liens of any lender providing DIP or cash collateral financing in these cases, and (b) to any claims under 11 U.S.C. §§ 503, 506(c) or 507(b); and (ii) shall not be subject to avoidance, priming or surcharge;

4. If additional premiums become due to insurance companies under the Policies in the Finance Agreement, the Debtor and FIRST (or its successor or assigns) are authorized to modify the Finance Agreement as necessary to pay additional premiums, without the necessity of further hearing or order of the Court;

5. FIRST is irrevocably appointed as attorney-in-fact in the event of default under the Finance Agreement. If the Debtor does not timely make payments when due or are otherwise in default under the terms of the Finance Agreement, the stay of Section 362(a) shall automatically lift (without further order of the Court) to enable FIRST and/or third parties, including insurance companies providing coverage under the Financed Policies, to take all steps necessary and appropriate to: (i) cancel the Financed Policies; (ii) collect, recover, or return the Finance Agreement Collateral to FIRST; (iii) apply the Finance Agreement Collateral to the Indebtedness; and (iv) take other remedial actions consistent with the terms of the Finance Agreement and applicable non-bankruptcy law. FIRST and/or third parties, including insurance companies providing coverage under the Financed Policies, exercising such rights shall comply with the notice provisions and other provisions of the Finance Agreement;

6. The Finance Agreement and the liens and security interests in the Finance Agreement Collateral granted to FIRST shall continue in full force and effect and the Indebtedness under the Finance Agreement shall remain owing notwithstanding: (i) the dismissal and/or conversion of the Debtor's case; (ii) the discharge of the Debtor; or (iii) the confirmation of a plan of reorganization or liquidation in the Debtor's case. FIRST is extending credit in good faith and is entitled to the protections of Section 364(e) of the Code;

7. If any Indebtedness remains unpaid after application of the Finance Agreement Collateral, following an event of a default or otherwise, such unpaid amount shall be treated as an administrative expense claim pursuant to Section 503(b)(1) of the Code in the Debtor's case;

8. If there are excess returned premiums, unearned premiums, or other Finance Agreement Collateral after application of the Finance Agreement Collateral to the Indebtedness, following an event of default or otherwise, the excess shall be turned over to the Debtor or any trustee subsequently appointed (under Chapter 7 or 11) for the Debtor;

9. Providing that if any insurance company needs to perform an audit on any of the Financed Policies, the Debtor and/or any trustee subsequently appointed (under Chapter 7 or 11) for the Debtor, shall cooperate therewith; and

10. The terms of the Order will be immediately effective and enforceable upon entry and that the Court shall retain jurisdiction with respect to any matters related to the implementation of this Order.

###

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
4675 MacArthur Court, Suite 1550, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled (*specify*):
**MOTION PURSUANT TO 11 U.S.C. § 364(b) TO ENTER INTO PREMIUM FINANCE AGREEMENT WITH FIRST INSURANCE FUNDING, A DIVISION OF LAKE FOREST BANK & TRUST COMPANY, N.A.; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF HOWARD GROBSTEIN IN SUPPORT THEREOF**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **July 1, 2026**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) ________ I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **July 1, 2026**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Scott C. Clarkson
United States Bankruptcy Court
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 1, 2026 | Bambi Clark | /s/ Bambi Clark |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **Kyra E Andrassy kandrassy@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com**
- **Jessica L Bagdanov jbagdanov@bg.law, ecf@bg.law**
- **Amir Gamliel agamliel@perkinscoie.com, cmallahi@perkinscoie.com;DocketLA@perkinscoie.com**
- **Craig S Ganz ganzc@ballardspahr.com, BKTDocket_West@ballardspahr.com;phxlsateam@ballardspahr.com**
- **Eric D Goldberg eric.goldberg@dlapiper.com, eric-goldberg-1103@ecf.pacerpro.com**
- **David M Goodrich dgoodrich@go2.law, kadele@go2.law;dfitzgerald@go2.law;wggllp@ecf.courtdrive.com**
- **Steven T Gubner sgubner@bg.law, ecf@bg.law**
- **Kenneth Misken Kenneth.M.Misken@usdoj.gov**
- **Shane J Moses smoses@foley.com, llanglois@foley.com;lanii-langlois-4514@ecf.pacerpro.com**
- **Stephen M. Mott smott@raineslaw.com, csantiago@raineslaw.com;bclark@raineslaw.com**
- **Michael S Myers myersm@ballardspahr.com, BKTDocket_West@ballardspahr.com;phxlsateam@ballardspahr.com**
- **David M Poitras dpoitras@bg.law**
- **David M Riley david.riley@us.dlapiper.com, davidzriley@gmail.com;DLAPiper@ecfxmail.com**
- **United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov**
- **Christopher A Ward cward@lowenstein.com, lsuprum@lowenstein.com**